2012 CO 30M

**Jack SUNAHARA, Jr., Petitioner**

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,**
Respondent.

No. 10SC409.

Supreme Court of Colorado,
En Banc.

April 30, 2012.

As Modified May 29, 2012.

Fogel Keating Wagner Polidori and Shafner, P.C., Michael O'B. Keating, Deirdre E. Ostrowski, John F. Poor, Denver, Colorado, Attorneys for Petitioner.

John R. Rodman & Associates, John R. Rodman, Caleb Meyer, Brendan P. Rodman, Denver, Colorado, Attorneys for Respondent.

Martin Conklin, P.C., John L. Conklin, J.R. Geraghty, Denver, Colorado, Attorneys for Amicus Curiae Kaiser Foundation Health Plan of Colorado.

Snell & Wilmer, L.L.P., Lee Mickus, Denver, Colorado, Attorneys for Amicus Curiae Colorado Civil Justice League.

The Viorst Law Offices, P.C., Anthony Viorst, Denver, Colorado, Attorneys for Amicus Curiae Colorado Trial Lawyers Association.

Justice RICE delivered the Opinion of the Court.

¶ 1 We review the court of appeals' unpublished decision in *Sunahara v. State Farm Mutual Automobile Insurance Co.*, No. 09CA0599, slip op., 2010 WL 1796501 (Colo.

App. May 6, 2010) (not selected for official publication), to determine: (1) whether the court of appeals erred under Colorado's collateral source doctrine when it admitted evidence of the amounts paid by Respondent State Farm Mutual Automobile Insurance Company (State Farm) for medical expenses that Petitioner Jack Sunahara incurred as a result of a car accident; and (2) whether the court of appeals erred in affirming the trial court's ruling that portions of State Farm's claim file and information used by State Farm to generate reserves and settlement authority were not discoverable.

¶ 2 We first hold that the court of appeals erred by affirming the admission of evidence of the amounts paid for Sunahara's medical expenses because the pre-verdict evidentiary component of Colorado's collateral source rule prohibits the admission. We also hold that the court of appeals correctly affirmed the trial court's exclusion of portions of State Farm's claim file from discovery because *Silva v. Basin Western Inc.,* 47 P.3d 1184, 1193 (Colo.2002), requires that result in this underinsured motorist action.

¶ 3 Therefore, we reverse the court of appeals' decision to affirm the trial court's admission of evidence of the amount paid by a collateral source to cover Sunahara's medical expenses, and affirm its decision to uphold the trial court's refusal to allow the discovery of the claim file and other documentation used to generate reserves and settlement authority.

### I. Facts and Procedural History

¶ 4 A vehicle driven by Raymond Mallard collided with Sunahara in a parking lot. Sunahara alleged that the accident resulted in injuries to his back and shoulders that required surgery and other medical treatment. He carried a motor vehicle insurance policy with State Farm at the time of the accident that included underinsured motorist (UIM) coverage. Sunahara reported the incident to State Farm pursuant to that policy. State Farm opened a claim file, made initial liability assessments, and established reserves and settlement authority for the case. State Farm then covered Sunahara's medical expenses, paying approximately $14,000 in

full satisfaction of the medical bills even though Sunahara's healthcare providers billed him over $50,000 for their services.

¶ 5 State Farm contacted Mallard's insurer and asserted that Mallard was fully responsible for Sunahara's injuries. In addition, State Farm's claim file log, to which Sunahara had access, stated that Mallard owed a one hundred percent duty to Sunahara for Mallard's failure to control his vehicle. With State Farm's permission, Sunahara subsequently sued Mallard for negligence. The action settled and Mallard's insurance company paid Sunahara $100,000 in damages—the limit on Mallard's policy.

¶ 6 Seeking additional damages, Sunahara then filed a UIM claim with State Farm pursuant to the UIM portion of his insurance policy. Sunahara's UIM coverage had a $2,000,000 limit and provided that State Farm would pay damages for bodily injury that Sunahara was legally entitled to collect from the owner or driver of an underinsured motor vehicle. State Farm argued in response to Sunahara's claim that Sunahara was at least partially at fault for the accident with Mallard, and that it was not required to pay Sunahara any damages pursuant to the UIM policy.

¶ 7 During discovery, Sunahara requested State Farm produce the claim file it opened when Sunahara first notified State Farm of the accident. State Farm produced a partially redacted claim file in response to the request. The produced file omitted reserves and settlement authority as well as liability assessments and related fault evaluations that pre-dated the litigation between Sunahara and State Farm. Sunahara filed a motion to compel production of the un-redacted file. State Farm again refused to produce as requested, arguing that *Silva,* 47 P.3d at 1193, protected the redacted information because it contained undeveloped liability assessments that State Farm made for the purpose of determining reserves and settlement authority. The trial court agreed with State Farm and denied Sunahara's motion to compel.

¶ 8 Sunahara also filed a motion in limine to exclude evidence of the discounted amount

State Farm paid to satisfy Sunahara's medical bills. The trial court denied the motion, reasoning that the $14,000 paid was admissible for the purpose of determining the reasonable value of Sunahara's medical expenses. State Farm subsequently presented the amounts paid evidence at trial. In addition, Sunahara's counsel explained to the jury that the difference between the $50,000 amount billed by Sunahara's healthcare providers and the $14,000 that they accepted to satisfy the bills was the result of a "managed health care contract." The trial court refrained from specifically informing the jury that the discounted payments were made by State Farm, and instructed the jury not to reduce Sunahara's damages automatically by the difference between the amount billed and the amount paid for Sunahara's medical expenses.

¶ 9 The jury returned a verdict in Sunahara's favor, but also found that Sunahara was 25 percent at fault for the accident. It awarded him $0 in past economic damages, $50,000 for noneconomic damages, $50,000 for physical impairment, and $11,000 for future economic damages. Sunahara moved for additur, or in the alternative a new trial pursuant to C.R.C.P. 59, on the grounds that the jury's refusal to award past economic damages was inadequate as a matter of law because Sunahara incurred medical expenses for his back and shoulder treatments prior to trial. Sunahara argued that the trial court's admission of the amount State Farm paid to satisfy Sunahara's medical bills erroneously led the jury to believe that Sunahara had not suffered past economic damages due to his receipt of health insurance benefits. The trial court denied the motion.

¶ 10 Sunahara appealed the trial court's admission of the amounts paid evidence and the trial court's denial of his motion to compel production of the un-redacted claim file to the court of appeals. The court of appeals affirmed both of the trial court's rulings in an unpublished opinion. We granted Sunahara's petition for certiorari to review both the collateral source and redacted claim file issues.[1]

## II. Admissibility of Evidence of the Amounts Paid by a Collateral Source

■ ¶ 11 The court of appeals erred under the common law evidentiary component of the collateral source rule when it affirmed the trial court's admission of evidence of the amounts paid by State Farm to cover Sunahara's medical expenses because a trial court may not admit evidence of the amounts paid by a collateral source to reimburse healthcare providers for medical expenses incurred by an insured plaintiff. After describing the applicable standard of review, we discuss the common law evidentiary component of the collateral source rule and the tension between that doctrine and the reasonable value rule stated in *Kendall v. Hargrave*, 142 Colo. 120, 123, 349 P.2d 993, 994 (1960). We then explain why the collateral source doctrine excludes amounts paid evidence in collateral source cases, like this one, when such evidence is offered for the purpose of determining the reasonable value of medical services.

### A. Standard of Review

■ ¶ 12 We review a trial court's evidentiary rulings for an abuse of discretion. *Hock v. New York Life Ins. Co.*, 876 P.2d 1242, 1251 (Colo.1994). A trial court necessarily abuses its discretion if its ruling is based on an incorrect legal standard. *BP Am. Prod. Co. v. Patterson*, 263 P.3d 103, 108 (Colo.2011). Whether the trial court applied the correct legal standard is a question of law we review de novo. *Corsentino v. Cordova*, 4 P.3d 1082, 1087–88 (Colo.2000).

1. We granted certiorari to determine:
 1. Whether the court of appeals erred in holding that the amount accepted in full payment for medical treatment was inadmissible in light of *Kendall v. Hargrave*, 142 Colo. 120, 123, 349 P.2d 993, 994 (1960) and its progeny, the common law collateral source rule, Colorado's collateral source statute, section 13–21–111.6, C.R.S. (2010) and section 10–1–135(10)(a), C.R.S. (2010).
 2. Whether the court of appeals erred in ruling that respondent's claim file and other documentation that attributed fault to the tortfeasor were not discoverable and were inadmissible.

## B. Common Law Evidentiary Component of the Collateral Source Rule

■ ¶ 13 Colorado's collateral source rule consists of two components: (1) a post-verdict setoff rule, codified at section 13–21–111.6, C.R.S. (2011); and (2) a pre-verdict evidentiary component, described by the common law.[2] The second component remains in effect,[3] applies in this pre-verdict case, and excludes evidence of collateral source benefits because such evidence could lead the fact-finder to improperly reduce the plaintiff's damages award on the grounds that the plaintiff already recovered his loss from the collateral source. *Volunteers of Am. v. Gardenswartz*, 242 P.3d 1080, 1083–84 (Colo.2010) ("To ensure that a jury will not be misled by evidence regarding the benefits that a plaintiff received from sources collateral to the tortfeasor, such evidence is inadmissible at trial."); *Moyer v. Merrick*, 155 Colo. 73, 80, 392 P.2d 653, 656–57 (1964) (since money received from a pension plan to which an employee had contributed was within the collateral source rule, evidence of receipt by plaintiff of pension benefits in an action for damages resulting from the defendant's negligence was inadmissible); *Carr v. Boyd*, 123 Colo. 350, 356–57, 229 P.2d 659, 663 (1951) ("Benefits received by the plaintiff from a source other than the defendant and to which he has not contributed are not to be considered in assessing the damages.").[4]

■ ¶ 14 As the United States Supreme Court reasoned in *Eichel v. New York Central Railroad Co.*, 375 U.S. 253, 254–55, 84 S.Ct. 316, 11 L.Ed.2d 307 (1963), evidence of a plaintiff's receipt of collateral source benefits is not only "inadmissible to offset or mitigate damages," but also "involves a substantial likelihood of prejudicial impact" if admitted for other purposes because "evidence of collateral benefits is readily subject to misuse by a jury." Thus, the evidentiary component of Colorado's common law collateral source rule completely bars the admission of collateral source evidence because the risk of the fact-finder's prejudicial misuse of the evidence outweighs its potential probative value if offered for other purposes. *Carr*, 123 Colo. at 359, 229 P.2d at 664; *see Eichel*, 375 U.S. at 254–55, 84 S.Ct. 316; see also CRE 403 (requiring exclusion of evidence, even if relevant, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury").[5]

## C. Tension between the Common Law Collateral Source and Reasonable Value Rules

■ ¶ 15 In *Crossgrove*, we resolved the tension between the reasonable value rule stated in *Kendall*, 142 Colo. at 123, 349 P.2d at 994, and the pre-verdict evidentiary component of the collateral source rule, described above. 2012 CO 31, ¶¶ 19–24, 276 P.3d 562. We held that the pre-verdict component of the collateral source rule controls in cases, like this one, in which a party offers evidence of the amount paid by a collateral source for the purpose of determining the

---

**2.** The Legislature codified the evidentiary component of the collateral source rule in 2010. *See* § 10–1–135(10)(a), C.R.S. (2011). While this opinion is consistent with section 10–1–135(10)(a), and with our opinion interpreting that statute—*Smith v. Jeppsen*, 2012 CO 32 (released concurrently with this opinion)—section 10–1–135(10)(a) does not govern this opinion because recovery occurred in the underlying action prior to the effective date of the statute.

**3.** We analyzed the impact of Colorado's collateral source statute, section 13–21–111.6, on the pre-verdict component of the common law doctrine in *Wal-Mart Stores, Inc. v. Crossgrove*. 2012 CO 31, 276 P.3d 562 (released concurrently with this opinion). There, we determined that section 13–21–111.6 only applies post-verdict and therefore does not abrogate the common law rule that bars collateral source evidence from admission.

**4.** We discussed the origins of the common law collateral source rule at length in *Crossgrove*, 2012 CO 31, ¶¶ 9–13, 276 P.3d 562. That case addressed the same collateral source issue we analyze here. For the sake of brevity, we find it unnecessary to fully discuss the development of the modern collateral source doctrine in this opinion.

**5.** We do not opine as to whether evidence of amounts paid by a collateral source for medical expenses is relevant to the reasonable value of those expenses because, whether relevant or not, the evidence is excluded under the collateral source doctrine.

reasonable value of the medical services rendered. *Id.* ¶ 20. We reached this holding by weighing the probative value of the evidence of amounts paid for the purpose of ascertaining the reasonable value of medical expenses against the likely prejudicial effect that admitting the evidence would have on the amount of damages awarded to the plaintiff. *Id.* ¶ 20–23. We concluded that admitting amounts paid evidence for *any* purpose in a collateral source case "carries with it an unjustifiable risk that the jury will infer the existence of a collateral source—most commonly an insurer—from the evidence, and thereby improperly diminish the plaintiff's damages award." *Id.* ¶ 20. As such, the common law evidentiary component of the collateral source rule prohibits the admission of amounts paid evidence in collateral source cases, even for the purpose of determining the reasonable value of medical services rendered.

### D. Amounts Paid Evidence is Inadmissible in this Case

¶ 16 In light of *Crossgrove,* our de novo review of the trial court's orders admitting amounts paid evidence in this case reveals that the trial court abused its discretion because it applied an incorrect legal standard—the reasonable value rule described in *Kendall*—rather than the common law evidentiary component of the collateral source rule. Under the proper legal standard, evidence of the amount paid by State Farm to satisfy Sunahara's medical bills is inadmissible because it is evidence of a collateral source benefit. A plaintiff's insurer is a collateral source because it is a third party wholly independent of the tortfeasor to which the tortfeasor has not contributed. *Van Waters & Rogers, Inc. v. Keelan,* 840 P.2d 1070, 1074 (Colo.1992) (quoting *Kistler v. Halsey,* 173 Colo. 540, 545, 481 P.2d 722, 724 (1971)). The amount paid in satisfaction of Sunahara's medical bills is a collateral source benefit because it is an amount paid to a healthcare provider by a collateral source on behalf of an insured plaintiff. Thus, the pre-verdict evidentiary component of the collateral source doctrine requires the exclusion of the amounts paid evidence. *See Gardenswartz,* 242 P.3d at 1083–84. As such, the court of appeals erred when it affirmed the trial court's order admitting the amounts paid by State Farm.

### E. Prejudicial Effect

¶ 17 Sunahara is entitled to a new trial on the issue of past economic damages because the trial court's erroneous admission of the amounts paid evidence prejudiced Sunahara's past economic damages award. We will only instruct the trial court to order a new trial because of the erroneous admission of evidence where the record affirmatively shows that the error was prejudicial. *Francis v. O'Neal,* 127 Colo. 432, 436, 257 P.2d 973, 975 (1953).

¶ 18 The record in this case shows that the trial court's erroneous admission of the amounts paid evidence *was* prejudicial, and therefore necessitates a new trial on past economic damages, because Sunahara received $0 in past economic damages, even though he sustained injuries as a result of the accident that required expensive medical treatment. Uncontroverted evidence showed that Sunahara's healthcare providers billed him over $50,000 prior to trial, and also indicated that the providers accepted about $14,000 to satisfy those bills due to the existence of a "managed health care contract." Although the trial court did not specifically instruct the jury that Sunahara carried insurance, the evidence of the amounts billed and the reference to the "managed health care contract" to explain why the medical providers accepted discounted payments almost certainly led the jury to conclude that Sunahara sustained $0 in past economic damages because his insurer paid his medical bills. This is precisely the prejudicial result that the evidentiary component of the collateral source rule seeks to prevent. *See Carr,* 123 Colo. at 359, 229 P.2d at 664. Because Sunahara suffered prejudice as a result of the trial court's erroneous admission of the amounts paid evidence, Sunahara is entitled to a new trial on past economic damages.

### III. Discoverability of the Unredacted Claim File

¶ 19 The court of appeals correctly held that the trial court did not abuse its

discretion by denying Sunahara's motion to compel discovery of the redacted portions of State Farm's claim file because ·*Silva,* 47 P.3d at 1193, protects the redacted information from discovery. Subject to the limitations of C.R.C.P. 26(b)(2), parties may discover non-privileged information "reasonably calculated to lead to the discovery of admissible evidence." C.R.C.P. 26(b)(1). The trial court has discretion to decide motions to compel discovery. *Stone v. State Farm Mut. Auto. Ins. Co.,* 185 P.3d 150, 155 (Colo.2008). This Court will uphold the trial court's ruling on a motion to compel discovery absent an abuse of discretion. *Id.* A trial court abuses its discretion if its ruling is "manifestly arbitrary, unreasonable, or unfair." *Hock,* 876 P.2d at 1251.

¶ 20 In *Silva,* we held that reserves and settlement authority were "not reasonably calculated to lead to admissible evidence," 47 P.3d at 1193, because they do not "reflect an admission by the insurance company that a claim is worth a particular amount of money," *id.* at 1190. We therefore concluded that reserves and settlement authority were not discoverable under C.R.C.P. 26(a)(1). *Id.* at 1193. Although this case is factually distinguishable from *Silva,* the same rationale applies here to protect from discovery the liability assessments and fault evaluations that State Farm used to develop its reserves and settlement authority.

¶ 21 We first define "reserves" and "settlement authority," describe their respective roles in an insurance company's initial claim investigation, and explain why *Silva* protects reserves and settlement authority from discovery. We then explain why *Silva* also applies here to protect the liability assessments and fault evaluations State Farm redacted from the claim file it produced to Sunahara.

### A. *Silva* Protects Reserves and Settlement Authority from Discovery

 ¶ 22 Upon receiving notice of a claim from an insured, an insurance company will establish reserves and settlement authority soon after opening the claim file. "Reserves" are the "funds insurance companies set aside to cover future expenses, losses, claims, or liabilities" associated with a particular case. *Id.* at 1189 (citing *Black's Law Dictionary* 1307 (6th ed. 1990)). Colorado law requires insurance companies to maintain reserves to assure the insurer's ability to satisfy its potential obligations under its policies. *See, e.g.,* § 10–3–201(1)(a)(V), C.R.S. (2011) (requiring insurance companies to maintain a minimum capital or guaranty fund and an accumulated surplus). Reserves are not an admission or valuation by the insurer; rather, they fulfill the insurance company's statutory obligations and reflect the insured's estimated potential liability on a particular claim. *Silva,* 47 P.3d at 1189.

 ¶ 23 The term "settlement authority" generally refers to an insurance agent's "ability to accept an offer of settlement that binds the principal up to and including a certain amount of money." *Id.* Like reserves, settlement authority does not constitute a "final, objective assessment of a claims [sic] worth to which an insurer may be held." *Id.* at 1190. Instead, both reserves and settlement authority reflect the insurer's "basic assessment of the value of a claim taking into consideration the likelihood of an adverse judgment, but do not normally entail a thorough factual and legal evaluation when routinely made as a claim analysis." *Id.* at 1191.

 ¶ 24 Taking the nature of reserves and settlement authority into account in *Silva,* we held that neither are reasonably calculated to lead to admissible evidence— and thus are not generally subject to discovery—because: (1) they do not accurately reflect the insurer's valuation of a particular claim; (2) they are not admissions of liability; and (3) insurance companies prepare them simply to satisfy statutory obligations and to establish bargaining tactics. *See id.* at 1188–91. Thus, as the court of appeals held in this case, reserves and settlement authority figures "are irrelevant to a jury's determination of liability and damages and are not reasonably calculated to lead to the discovery of admissible evidence." *Sunahara,* No. 09CA0599, slip op. at 18.

## B. *Silva* also Applies to Information Used to Develop Reserves and Settlement Authority

¶ 25 Like reserves and settlement authority figures themselves, liability assessments and similar cursory fault evaluations used by an insurance company to develop reserves and settlement authority are not reasonably calculated to lead to the discovery of admissible evidence. The trial court in this case correctly reasoned that "insurance companies have to be free to make ... internal assessments" and that those internal assessments "directly bear on [the insurance company's] reserve decisions." It also correctly found that *Silva* should extend to this situation because it would be absurd to protect the end result of the insurance company's initial evaluation process—the reserves and settlement authority—without also protecting the assessments that led to those numbers.

¶ 26 The trial court did not abuse its discretion because State Farm used the information it redacted from the produced claim file for the limited internal purposes of setting reserves and determining settlement authority to comply with insurance regulatory standards and to estimate its potential financial liability. Like the reserves and settlement authority themselves, the information State Farm redacted from the claim file it produced to Sunahara did not contain a thorough evaluation of Sunahara's claim, did not reflect an admission of any party's liability for the accident, and did not constitute an admission by State Farm that Sunahara's claim was worth a particular amount of money. The reasoning we applied in *Silva* therefore applies here to protect the redacted portion of the State Farm claim file from discovery. Thus, the court of appeals correctly determined that the trial court did not abuse its discretion when it denied Sunahara's motion to compel.

¶ 27 The factual differences between this case and *Silva* do not alter our conclusion. *Silva* involved a "third-party" personal injury case between an injured plaintiff and an allegedly-negligent defendant. 47 P.3d at 1191–92. The plaintiff moved the trial court to compel the production of correspondence between the defendant and its insurer regarding reserves and settlement authority because the plaintiff believed the correspondence was relevant to the defendant's insurance company's valuation of the case. *Id.* at 1192.

¶ 28 In contrast, the underlying action here involves a type of "first-party" claim in which Sunahara is suing his own insurance company, State Farm, for UIM benefits. We noted in *Silva* that first-party cases differ from third-party cases because, in a first-party action, the defendant insurance company owes the plaintiff-insured a duty of good faith. *Id.* at 1193. The UIM context of this case, however, places the insurance company in the "unique role" of becoming almost adversarial to its own insured. *Peterman v. State Farm Mut. Auto. Ins. Co.*, 961 P.2d 487, 494 (Colo.1998). UIM coverage is designed to put a driver who is injured by an underinsured motorist in the same position as if the underinsured motorist had liability limits in amounts equal to the insured's coverage. *USAA v. Parker*, 200 P.3d 350, 358 (Colo.2009). Thus, the fact-finder in a UIM case must weigh the evidence presented by the defendant insurance company, essentially standing in the shoes of the underinsured motorist, against the evidence presented by the injured plaintiff. The defendant insurance company will naturally attempt to minimize the plaintiff's damages in such a case because doing so serves the company's financial interests. As such, the scope of discovery of reserves and settlement authority in first-party UIM actions is similar to the scope of discovery in third-party actions, like *Silva*, because the relationship between the parties is similarly adversarial.

¶ 29 Furthermore, we noted in *Silva* that reserves and settlement authority—and, under our reasoning in this case, the liability assessments and fault evaluations underlying those figures as well—might be relevant and reasonably calculated to lead to admissible evidence when a first-party plaintiff sues his or her insurance company for bad faith or for a declaratory judgment. *Silva*, 47 P.3d at 1193. In bad faith and declaratory judgment actions, evidence of reserves and settlement authority could shed light on whether the

insurance company adjusted a claim in good faith, or promptly investigated, assessed, or settled an underlying claim. *Id.* UIM actions differ from bad faith and declaratory judgment cases because, rather than defending its *own* actions, an insurance company in a UIM action must essentially defend the tortfeasor's behavior. As such, evidence of the liability assessments and fault evaluations underlying reserves and settlement authority is not reasonably calculated to lead to the discovery of admissible evidence in UIM actions, just as it is not reasonably calculated to lead to admissible evidence in a third-party action like *Silva.*

## IV. Conclusion

¶ 30 We affirm the court of appeals' interpretation of *Silva* and its decision to uphold the trial court's denial of Sunahara's motion to compel production of the un-redacted claim file because liability assessments and fault evaluations underlying an insurance company's reserves and settlement authority in a UIM action are not reasonably calculated to lead to admissible evidence as required by C.R.C.P. 26(b)(1).

¶ 31 We reverse the court of appeals' decision to affirm the trial court's ruling admitting evidence of the amounts paid by State Farm to cover Sunahara's medical expenses, however, because the trial court abused its discretion by applying the reasonable value rule rather than the common law evidentiary component of the collateral source doctrine. We therefore remand this case to the court of appeals, and direct that it remand to the trial court with instructions to hold a new trial on the issue of past economic damages only. This new trial shall be limited to the consideration of evidence relevant to the determination of Sunahara's past economic damages award. The trial court additionally may consider issues relating to statutory interest or costs.

Chief Justice BENDER concurs in part and dissents in part.

Justice EID concurs in part and dissents in part, and Justice COATS and Justice BOATRIGHT join in the concurrence in part and dissent in part.

Chief Justice BENDER, concurring in part and dissenting in part.

¶ 32 I agree with the majority's holding that the court of appeals incorrectly applied the collateral source rule. However, I write separately because I respectfully disagree with the majority's holding in Part III of its opinion that the unredacted portions of Sunahara's claim file were not discoverable. For the reasons discussed below, I would remand for retrial on the issues of liability and damages. Hence, I concur in part and dissent in part.

¶ 33 The majority acknowledges that this case is factually distinct from our decision in *Silva v. Basin Western, Inc.,* 47 P.3d 1184 (Colo.2002), but nonetheless holds that the reasoning underlying *Silva* supports its conclusion that an insured's own claim file is non-discoverable in an action to recover uninsured motorist (UIM) benefits from his insurer. I agree with the majority that in so-called "third-party" claims,[1] *Silva* can likely be extended to bar the discovery of information that is the basis for determining reserves and settlement authority (e.g. liability assessments, fact recitations, and related information). Maj. op. ¶¶ 25–26. However, because I believe that the present claim is a "first-party" claim of the type that was expressly excluded from our decision in *Silva,* I would hold that the information in State Farm's claim file, including State Farm's statement that Mallard (the defendant in the first action) was 100 percent at fault and Sunahara was 0 percent at fault, was discoverable. Because this admission of State Farm, a party-opponent in the present dispute, would likely have been admissible at trial, it may have impacted the jury's deter-

---

1. A third-party personal injury claim is a case in which an injured plaintiff sues an allegedly negligent defendant, who is covered by an insurance company that will pay out to the plaintiff if the defendant is found to have been liable. *See Silva,* 47 P.3d at 1193. In contrast, a first-party action is between an insured and her insurer and involves either an insured's allegation that her insurer adjusted a claim in bad faith or the insurer's request for a declaratory judgment that it is not responsible for its insured's claim. *See id.*

mination of comparative fault. Thus, I would remand the case for a new trial on the issues of both liability and damages, rather than just damages as held by the majority. *See id.* at ¶ 31.

¶ 34 In *Silva,* we held that an injured plaintiff in a third-party personal injury case could not discover the defendant's insurer's reserve and settlement authority. 47 P.3d at 1193. We concluded that in the context of a third-party personal injury claim, such information, as a matter of law, was not "reasonably calculated to lead to admissible evidence." *Id.* We based this on the grounds that such information: (1) does not accurately reflect the insurer's valuation of a particular claim; (2) does not constitute an admission of liability; and (3) is prepared by an insurance company solely to fulfill a statutory duty and to establish bargaining tactics for agents attempting to settle claims. *See id.* at 1189. We held, however, that this rationale was only sufficient to justify a bar on discovery of an insurance claim file prepared by the defendant's insurance company in a third-party action. *Id.* at 1191–92. *Silva* explicitly contrasted the third-party claim at issue in that case with discovery in a first-party claim and acknowledged that "[t]he scope of discovery of insurance information should be broader in a first-party claim between an insured party and his insurer than in a third-party personal injury claim." *Id.* at 1192.

¶ 35 To that end, in *Tayler v. Travelers Ins. Co.,* 183 F.R.D. 67, 72 (N.D.N.Y.1998), the case that we cited in *Silva* to draw a distinction between discoverability in first-party actions and non-discoverability in third-party actions, the federal district court for the Northern District of New York flatly rejected the holding that the majority now reaches. There, on similar facts to the present case, an injured driver first sued another driver for his personal injuries. *Id.* at 68. That initial suit ultimately settled for the maximum of the other driver's insurance coverage. *Id.* Because the injured driver's injuries exceeded this amount, he sought to recover his remaining damages under the UIM provision of his insurance policy, which eventually resulted in litigation between the driv-

er and his insurer. *Id.* In this UIM action, the driver sought to discover the claim file that his insurer had compiled in response to his initial claim. *Id.* When his insurer refused to release the file, the driver filed a motion to compel. *Id.*

¶ 36 In ordering the insurance company to produce the claim file, the *Tayler* court reasoned that a first-party claim for UIM benefits was distinguishable from third-party claims where such information was found to be non-discoverable. *Id.* at 71. The court explained that unlike third-party claims, which are essentially personal injury claims based in tort, a first-party UIM claim arises under contract because a first-party UIM claim alleges that the insurer failed to comply with its contractual obligation to make the insured whole in the event that the liable party has insufficient resources and/or insurance coverage to do so itself. *Id.* at 70–71. In a first-party claim, "the insured 'is asking for payment under the terms of the insurance contract between him and the insurance company, and the insurance company owes [the insured] a duty to adjust his claim in good faith.'" *Id.* (quoting *Weitzman v. Blazing Pedals, Inc.,* 151 F.R.D. 125, 126 (D.Colo. 1993)).

¶ 37 The majority holds that a first-party UIM claim is distinguishable from a first-party bad faith claim. Maj. op. ¶¶ 28–29. In my opinion, in this context, there is no distinction between a first-party claim that an insurer adjusted the insured's claim in bad faith and a first-party UIM claim. Each claim involves bad faith and each claim derives under the terms of the insurance contract. Hence, I agree with the reasoning of the *Tayler* court, which we expressly acknowledged and cited in *Silva.* Because a first-party UIM claim is akin to a contract action, the responsibility of the insurer is to act in good faith and fulfill its contractual obligations and not to "stand[ ] in the shoes of the uninsured motorist." *Cf.* maj. op. ¶ 28. As such, I believe that the insurer's initial investigation, impressions, and conclusions regarding fault and damages are relevant, as a matter of law, to subsequent UIM litigation. *See also Lipton v. Superior Court,* 48 Cal.App.4th 1599, 1614, 56 Cal.Rptr.2d 341

(1996) (statutorily required loss reserve relevant to first-party bad faith claim); *North River Ins. Co. v. Greater New York Mut. Ins. Co.*, 872 F.Supp. 1411, 1412 (E.D.Pa.1995) (same); *Champion Int'l Corp. v. Liberty Mut. Ins. Co.*, 128 F.R.D. 608, 612 (S.D.N.Y. 1989) (same).

¶ 38 Here, in the initial personal injury suit filed by Sunahara against Mallard, State Farm unequivocally maintained that Mallard was completely at fault. State Farm noted in the unredacted portion of Sunahara's claim file that Mallard was 100 percent at fault. State Farm also sent a letter to Mallard's insurance carrier stating: "Our investigation establishes that your insured is responsible for the accident."[2] However, once Mallard's insurance was exhausted—and it became clear that Sunahara would invoke the UIM coverage under his State Farm policy—State Farm immediately changed its tune and claimed that Sunahara was at least partially at fault for the very same accident. Thus, State Farm was either disingenuously inflating Sunahara's initial claim against Mallard, which would violate the requirement that it reasonably estimate its potential liability in setting a reserve, *see Silva*, 47 P.3d at 1189, or it was acting in bad faith in adjusting the UIM claim of its insured, Sunahara.

¶ 39 The jury did not hear evidence that State Farm previously determined that Mallard was 100 percent at fault. Ultimately, the jury returned a verdict that Mallard was only 50 percent responsible for Sunahara's injuries. The jury concluded that the remaining fault was split equally by Sunahara and his son, who was also present at the scene of the accident. Accordingly, the trial judge reduced Sunahara's damages in the UIM claim by 50 percent.

¶ 40 By concluding that an insurer's claim file is not discoverable in a first-party UIM action, the majority's holding serves as tacit approval of State Farm's inconsistent positions and the resultant detriment to its own insured. My reading of *Silva* would deter an insurance company from taking such inconsistent positions. Under my reading, if an insurance company like State Farm were to take inconsistent positions as to culpability or damages in a first-party UIM action following an initial third-party personal injury claim, such information could be uncovered through discovery and then potentially placed in full view of the jury as a business record or an admission against interest. If an insurance company knows that it will have to disclose its claim file to its insured should the claim eventually proceed to UIM litigation, then the insurance company will have a substantial incentive to assess liability reasonably and to estimate damages in good faith from the outset. This provides the best result for both a defendant in the initial third-party action (who will not be unfairly subjected to the plaintiff's insurance company's trumped up claims) and an insured plaintiff in any subsequent first-party UIM action (who will not be subjected to her insurance company reversing course on its initial assessment in an effort to pay as little as possible in UIM benefits).

¶ 41 Ultimately, the ability to discover the claim file in a first-party UIM action would force an insurance company to place its duty to adjust its insured's claim in good faith above "the company's financial interests." *Cf.* maj. op. ¶ 28. I believe that this is the only result that is consistent with both our holding in *Silva* and the general principle that "[i]n close cases, the balance must be struck in favor of allowing discovery." *Direct Sales Tire Co. v. Dist. Court*, 686 P.2d

---

**2.** I note that the letter that State Farm sent to Mallard's insurer claiming that Mallard was completely at fault for the accident should likely have been admissible at the underlying trial between Sunahara and State Farm, as a relevant statement against interest by a party opponent. CRE 801(d)(2)(A) ("A statement is not hearsay if ... (2) [t]he statement is offered against a party and is (A) the party's own statement....."). For unknown reasons (because the ruling of the trial judge was made off the record), this document was excluded from the trial as inadmissible.

However, although Sunahara briefed this issue before us and it was arguably included within the second issue for which we granted certiorari, this issue was not properly raised before the court of appeals and thus was not preserved for our review. *See Am. Family Mut. Ins. Co. v. DeWitt*, 218 P.3d 318, 326 (Colo.2009) (reasoning that even if a proper objection is made at trial, failure to argue the issue before the court of appeals renders an issue unfit for appellate review by this court).

1316, 1321 (Colo.1984). Because, once discovered, State Farm's claim file would likely be admissible at trial and might impact the jury's determination of comparative fault, I would remand this case for retrial on the issue of liability, in addition to the majority's remand on the issue of damages in accordance with its interpretation of the collateral source rule. Thus, I respectfully dissent from Part III of the majority's opinion.

Justice EID, concurring in part and dissenting in part.

¶ 42 Although I join Part III of the majority's opinion, I dissent from Part II for the reasons set forth in my dissent in *Wal–Mart v. Crossgrove*, 2012 CO 31, 276 P.3d 562. Unlike the majority, I would hold that the fact that a medical provider accepted an amount less (here, $14,000) than the amount billed (here, $50,000) as full payment is admissible because it is relevant to the reasonable value of medical services provided, and does not run afoul of the collateral source doctrine because the identity of who paid the medical provider (in this case, plaintiff's health insurer) is irrelevant. More importantly, however, I note that the majority exacerbates its erroneous legal conclusion in this case by ordering that a new trial be held on past economic damages where there is no possibility the plaintiff could recover on his uninsured motorist claim against his insurer, even under the majority's interpretation of the collateral source doctrine. That is because even if the full $50,000 in past economic damages requested by the plaintiff were added to the jury award, the tortfeasor's insurer has already paid the plaintiff more than what such an augmented award would have provided, leaving no uninsured loss. Accordingly, I respectfully dissent from Part II of the majority's opinion.

¶ 43 In his motion for additur or a new trial, the plaintiff argued that the district court had erred in permitting the jury to hear the fact that the medical providers accepted less than the amounts billed, and asked that the full amount billed, $50,000, be added to the verdict. In denying the motion, the district court held that, even if the plaintiff were correct that the jury should not

have been permitted to hear that the providers accepted less than they billed, it would result in no overall increase in the damages awarded in the case. In an uninsured motorist case such as this one, a plaintiff can recover only if he proves that he has some loss that has not already been compensated by the tortfeasor. *See* § 10–4–609(5), (6), C.R.S. (2011); *Sunahara v. State Farm Mut. Auto. Ins. Co.*, 2012 CO 30, ¶ 36 (Bender, C.J., concurring in part and dissenting in part). Here, the parties stipulated to the fact that the plaintiff had already received $100,000 from the tortfeasor's insurer; thus, the plaintiff would have to show that he suffered more than $100,000 in loss to succeed on his uninsured motorist claim against his insurer. The district court reasoned that plaintiff could not make such a showing because even if the full $50,000 requested by the plaintiff in past economic damages were added to the verdict, the total jury award, after reduction for comparative negligence, would amount to approximately $80,000. In other words, the plaintiff would not be entitled to recover any amount of uninsured motorist coverage because his loss was already fully compensated.

¶ 44 The majority acknowledges a new trial should be ordered only where it has been demonstrated that "the error was prejudicial." Maj. op. ¶ 17. The majority asserts that there was prejudice in this case because plaintiff was awarded "$0 in past economic damages" even though there was evidence of "expensive medical treatment" as demonstrated by the medical bills. *Id.* at ¶ 18. The majority goes on to conclude that the fact that the jury was aware that the medical providers accepted less than the amount billed "almost certainly led the jury to conclude that Sunahara sustained $0 in past economic damages...." *Id.* As noted above, however, even if the jury were to award the full amount the plaintiff sought for past economic damages—that is, the full amount billed—the outcome of the case would not change, as the plaintiff would still not recover on his uninsured motorist claim.

¶ 45 The majority gives no indication in its opinion that the district court erred in its determination that the collateral source issue

makes no difference to the overall damage award in this case. And although it limits the new trial to past economic damages, maj. op. at ¶ 31, that new trial, even if so limited, is a waste of judicial resources.

¶ 46 Finally, I disagree with the majority's assertion, noted above, that because the jury knew plaintiff's medical providers accepted less than $50,000 in payment for the medical bills, it awarded no past economic damages. The majority does not consider an alternative explanation of the jury's award—namely, that the nature of the plaintiff's injuries was hotly contested at trial by both sides, including the fact that he had significant pre-existing injuries to both of his shoulders and his lower back. Thus, while there may have been "uncontroverted evidence" that the plaintiff was billed $50,000 by his medical providers after the accident, maj. op. at ¶ 18, the evidence of what caused his injuries— specifically, his pre-existing conditions or the accident—was strongly controverted. It was the jury's duty, not ours, to weigh the conflicting evidence and to decide the cause of plaintiff's injuries.

¶ 47 Moreover, the district court, in its words, took "special steps to make sure the jury was not informed that these discounted payments were made by Plaintiff's health insurer." As in *Crossgrove*, 2012 CO 31, 276 P.3d 562 (Eid, J., dissenting), the jury here was never informed that plaintiff's insurer paid the medical providers. Further, the jury was specifically instructed that it was the "sole judge[ ]" of the reasonable value of medical services provided to the plaintiff that were necessitated by the accident. Because the district court did not err in permitting the jury to hear the fact that the medical providers accepted less than what they billed as payment for their services, I respectfully dissent from Part II of the majority's opinion.

I am authorized to state that Justice COATS and Justice BOATRIGHT join in the concurrence in part and dissent in part.