COLORADO COURT OF APPEALS    2016COA152

Court of Appeals No. 15CA0918
City and County of Denver District Court No. 13CV32699
Honorable Catherine A. Lemon, Judge

_____

Perfect Place, a Colorado limited liability company,

Plaintiff-Appellant and Cross-Appellee,

v.

R. Parker Semler,

Defendant-Appellee and Cross-Appellant.

_____

JUDGMENT AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE FREYRE
Román and Lichtenstein, JJ., concur

Announced October 20, 2016

_____

Podoll & Podoll, P.C., Richard B. Podoll, Robert C. Podoll, Robert A. Kitsmiller,
Greenwood Village, Colorado, for Plaintiff-Appellant

Semler & Associates, P.C., R. Parker Semler, Andrew Oh-Willeke, Jeremy
Goldblatt, Denver, Colorado, for Defendant and Cross-Appellee

¶ 1    In this case, we are asked to decide a matter of first impression — whether § 38-33.3-213, C.R.S. 2016, of the Colorado Common Interest Ownership Act (CCIOA), pertaining to the subdivision of units, requires strict or substantial compliance.  We conclude, consistent with the statutory language and the purposes of CCIOA, that substantial compliance is required.

¶ 2    In this quiet title action, plaintiff, Perfect Place, LLC, (a member of the Blake Street homeowner's association) appeals the trial court's judgment finding that defendant, R. Parker Semler, owns parking spaces C and D in the 1940 Blake Street Condominium (Blake Street) property.[1]  Semler cross-appeals the court's equitable enlargement of the historical dimensions of parking space E and its corresponding decrease in the size of parking space D.  He also seeks an award of attorney fees under CCIOA.  We affirm the trial courts finding that the parking spaces were properly subdivided and that Semler owns spaces C and D.  However, because we conclude that the trial court erred when it

_____

[1] Nathan and Kari Peters were also named as defendants in the original complaint.  They reached a settlement with Perfect Place concerning space E before trial.

1

adjusted the size of space E, and because we conclude the court erred when it denied Semler's motion for attorney fees, we reverse in part, and remand the case for further proceedings.

## I.     Background

¶ 3     This case arises from a quiet title action in which Perfect Place asserted ownership of three parking spaces in the Blake Street property.  In 2000, Blake Street bought a mixed use residential and commercial building and recorded a written declaration subjecting the property to the provisions of CCIOA.  Thereafter, Blake Street sold a majority interest in the building to Quail Street Company, LLC (Quail Street).  Quail Street's principal and sole shareholder was John Watson.  Watson owned the majority of the building for several years and made multiple changes to it, including subdividing the garage into three individual parking spaces (C, D, and E) by painting yellow dividing lines on the garage wall.  Spaces C and D were full-sized parking spaces and accommodated normal-sized vehicles.  Space E was smaller and was only able to accommodate a motorcycle or a very small car.

¶ 4     Over time, Watson sold the individual parking spaces (as part of condominium units) to different buyers, who subsequently sold

2

or mortgaged the spaces. Through the years, the City and County of Denver taxed each space individually, the Blake Street homeowners association separately assessed dues for each space, and title insurance companies separately insured the spaces during subsequent title transfers.

¶ 5 The subsequent title transfers are set forth in detail in Appendices 1 and 2. As relevant here, Semler claimed title to space C from a 2007 foreclosure proceeding in which he paid $641,000[2] during the redemption period and obtained a deed in lieu of foreclosure. Semler claimed title to space D through a different foreclosure proceeding in which he obtained a deed in lieu of foreclosure from the record owner.

¶ 6 In 2010, the association's attorney notified Semler and Perfect Place of clouded title concerning spaces D and E. Thereafter, Semler paid more than $35,000 for a quitclaim deed from the former record owner of space D and recorded that deed in 2012. He claimed title to space E from a different deed in lieu of foreclosure that stemmed from an unlawful conveyance and that became part of the same 2007 foreclosure proceeding. *See infra* Part IV.

---

[2] This amount included a condominium unit.

¶ 7     Perfect Place claimed title to all three spaces from a 2011 quitclaim deed it received from Watson.[3]  After receiving notice of title problems with spaces D and E, Perfect Place paid Watson ten dollars for the 2011 quitclaim deed and promptly recorded it.

¶ 8     Perfect Place also claimed title to spaces D and E from a series of conveyances originating from a wild deed, *see infra* Part IV.  It paid ten dollars to Newtown Ten for a quitclaim deed purporting to convey spaces "D and/or E."

¶ 9     Perfect Place brought this quiet title action asserting superior title to all three spaces based on the 2011 quitclaim deed.  It further alleged that all previous conveyances of the spaces were invalid because Watson had never properly subdivided the garage in accordance with the provisions of CCIOA.

¶ 10    Semler contended that Watson properly subdivided the garage, that Perfect Place obtained the 2011 quitclaim deed from Watson through fraudulent misrepresentations, and that Perfect Place was not a bona fide purchaser for value because it only paid ten dollars for the 2011 quitclaim deed.

---

[3] In 2013, Watson signed a new quitclaim deed to correct errors in the 2011 deed.  We refer to the 2011 deed as the one purportedly conveying title and the 2013 deed as the correction deed.

4

## A. Trial Court's Order

¶ 11 After a three-day hearing, the trial court found that Watson subdivided the garage unit into three separate parking spaces. It also found that Perfect Place procured the 2011 quitclaim deed by fraud, concealment, and unclean hands. The court therefore concluded that Semler was the rightful owner of spaces C and D.

¶ 12 Title to space E was resolved in favor of Perfect Place by agreement of the parties after Perfect Place reached a pretrial settlement with defendants Kari and Nathan Peters. Finding that the equities weighed in favor of Semler, the court ordered him to draft a proposed amendment to the Blake Street declaration, including a new map depicting the boundaries of the three spaces. It intended for Semler to record the amended map and to submit it to the homeowners association for inclusion in the Blake Street declaration.

## B. Post-Trial Orders

¶ 13 Pursuant to the trial court's order, Semler submitted a proposed map allotting space C 132 square feet, space D 132 square feet, and space E 90 square feet. In computing these dimensions, Semler relied on the historical boundaries of spaces C

and D and the dimensions of space E set forth in a recorded Parking Space Licensing Agreement negotiated between Perfect Place and Nathan and Kari Peters as a part of their pretrial settlement.

¶ 14     Perfect Place objected to Semler's proposal and argued that "everyone understood that there were to be 3 parking spaces in the Parking Space Unit," and that "[t]he map proposed by Semler would effectively prevent [it] from using parking space E as a parking space." Perfect Place submitted its own proposed map that would "accommodate three cars" and that "properly indicated a large brick pillar between spaces C and D." It also requested an evidentiary hearing.

¶ 15     The trial court began the hearing by noting that the weight of the trial evidence suggested that space E was a usable parking space for a small car, and that it intended, as an equitable matter, to create three usable parking spaces in order to avoid future litigation. After the hearing, the court found that space E had always been smaller than spaces C and D, and it again acknowledged that the balance of the equities weighed in favor of Semler. In its final order, however, the court adopted a map that

6

allotted space C 129 square feet, space D 114 square feet, and space E 122 square feet.

## II. Propriety of Subdivision Under CCIOA

¶ 16 Perfect Place contends that the absence of a formal application to the association's board describing a reapportionment of the common elements, as well as the absence of an amended declaration or condominium map that strictly complies with CCIOA, violates § 38-33.3-213. Perfect Place asserts that because CCIOA was violated, spaces C, D, and E were never properly subdivided and, instead, constitute a single unit as a matter of law. Semler contends that the trial court's subdivision findings are factual findings that are supported by the record. We agree with Semler and conclude that Watson substantially complied with CCIOA when he subdivided the garage into three parking spaces.

¶ 17 After trial, the court found that one of two events occurred to subdivide the garage: (1) either the original declarant subdivided the garage when it filed the original declaration or (2) the first purchaser and majority unit holder, Watson, subdivided the garage into three spaces — C, D, and E — when he placed physical demarcation lines on the garage wall separately identifying each

7

space. It concluded that if Watson subdivided the units, his failure to comply with the technical requirements of § 38-33.3-213 did not "materially violate CCIOA," because he substantially complied with the spirit and purpose of the law. The trial court reasoned that any other reading of the statute would elevate "form over substance."

¶ 18   We conclude the record supports the trial court's finding that Watson subdivided the garage into three separate parking spaces and that Watson substantially complied with the provisions of CCIOA when doing so. Because minor deficiencies should not render otherwise marketable title unmarketable, we further conclude that substantial compliance with the requirements of § 38-33.3-213 is sufficient to satisfy the application procedures for subdividing a unit. Finally, because we may affirm a trial court's ruling on any grounds that are supported by the record, we need not address the trial court's alternative finding that the original declarant subdivided the garage. *See Rush Creek Sols., Inc. v. Ute Mountain Ute Tribe*, 107 P.3d 402, 406 (Colo. App. 2004).

## A.    Statutory Interpretation

¶ 19   We review issues of statutory construction de novo. *See Gagne v. Gagne*, 2014 COA 127, ¶ 25. We review a court's factual

8

findings for clear error and defer to those findings unless they are not supported by the record. *E-470 Pub. Highway Auth. v. 455 Co.*, 3 P.3d 18, 22 (Colo. 2000).

¶ 20  In interpreting a statute, our primary objective is to ascertain and effectuate the intent of the General Assembly. *Specialty Rests. Corp. v. Nelson*, 231 P.3d 393, 397 (Colo. 2010). "If the statutory language is clear, we interpret the statute according to its plain and ordinary meaning." *Id.* We read words and phrases in context and construe them according to their common usages. *Gagne*, ¶ 25. We also interpret a statute in a way that best effectuates the purpose of the legislative scheme. *Id.* at ¶ 26. When construing a statute, we read and consider the statute as a whole and interpret it in a manner that gives consistent, harmonious, and sensible effect to all of its parts. *Id.*

¶ 21  "Not all directives and requirements declared in statute law should be understood to have equal force[;]" therefore, "[w]hether less than full compliance with particular provisions is permitted is an issue of statutory construction." *Wainscott v. Centura Health Corp.*, 2014 COA 105, ¶ 24 (quoting 3 Norman J. Singer & J.D. Shambie Singer, Sutherland Statutory Construction § 57:1, at 6

(7th ed. 2012)) (alteration omitted). Where the purposes of a statutory requirement are satisfied, substantial, rather than strict or absolute, compliance may be sufficient. *See Finnie v. Jefferson Cty. Sch. Dist. R–1*, 79 P.3d 1253, 1257-58 (Colo. 2003); *Meyer v. Lamm*, 846 P.2d 862, 876 (Colo. 1993); *Woodsmall v. Reg'l Transp. Dist.*, 800 P.2d 63, 67-68 (Colo. 1990); *Denver Classroom Teachers Ass'n v. City & Cty. of Denver Sch. Dist. No. 1*, 2015 COA 71, ¶ 46.

¶ 22    In determining whether a particular statutory requirement has been satisfied, courts have imposed a degree of compliance consistent with the objective sought to be achieved by the legislation under consideration. *Woodsmall*, 800 P.2d at 67; *see, e.g., People v. Stanley*, 169 P.3d 258, 261 (Colo. App. 2007) (holding that substantial compliance is "actual compliance [with] respect to the substance essential to every reasonable objective of the statute, as distinguished from mere technical imperfections of form" (quoting *People v. Jacobs*, 729 P.2d 757, 763-64 (Cal. 1987))). If the statute requires only substantial compliance, a court must then consider whether "the allegedly complying acts fulfilled the statute's purpose." *Grandote Golf & Country Club, LLC v. Town of La Veta*, 252 P.3d 1196, 1203 (Colo. App. 2011); *see also Bd. of Cty.*

10

*Comm'rs v. City & Cty. of Denver*, 193 Colo. 325, 327-30, 566 P.2d 335, 337-38 (1977) (finding a statutory requirement that a map and a school board resolution accompany an annexation petition was substantially complied with where the map and resolution were available to the city council when it considered the petition).

### B.     Substantial or Strict Compliance

¶ 23     In enacting CCIOA, the General Assembly intended a "clear, comprehensive, and uniform framework for the creation and operation of common interest communities." § 38-33.3-102(1)(a), C.R.S. 2016.  One of the principal purposes of CCIOA is to "promote effective and efficient property management through defined operational requirements that *preserve flexibility* for such homeowner associations." § 38-33.3-102(1)(d) (emphasis added). The General Assembly intended most common interest communities to be bound by CCIOA and that developers have "*flexible* development rights with specific obligations within a uniform structure of development of a common interest community." § 38-33.3-102(1)(c) (emphasis added).

¶ 24     While one goal of CCIOA is uniformity, the General Assembly has balanced that goal against the goal of flexibility, indicating that

11

a rigid or strict interpretation is not favored. For example, § 38-33.3-203(4), C.R.S. 2016, states: "Title to a unit and common elements is not rendered unmarketable or otherwise affected by reason of an *insubstantial failure* of the declaration to comply with this article. Whether a substantial failure impairs marketability is not affected by this article." (Emphasis added.) Keeping these purposes in mind, we examine the plain language of § 38-33.3-213, which concerns subdividing units.

¶ 25    Section 38-33.3-213(1) provides that "[i]f the declaration expressly so permits, a unit may be subdivided into two or more units."[4] The remainder of § 38-33.3-213 sets forth the procedures a unit owner must follow to subdivide property:

> (2) In order to subdivide a unit, the unit owner of such unit, as the applicant, *must* submit an application to the executive board, which application *shall* be executed by such owner and *shall* include:
>
> (a) Evidence that the applicant of the proposed subdivision shall have complied with all building codes, fire codes, zoning codes, planned unit development requirements, master plans, and other applicable ordinances

---

[4] The parties do not dispute, and the admitted Blake Street declaration confirms, that subdivision by the first purchaser from the grantor is permitted.

12

or resolutions adopted and enforced by the local governing body and that the proposed subdivision does not violate the terms of any document evidencing a security interest encumbering the unit;

(b) The proposed reallocation of interests, *if any*;

(c) The proposed form for amendments to the declaration, including the plats or maps, *as may be necessary* to show the units which are created by the subdivision and their dimensions, and identifying numbers;

(d) A deposit against attorney fees and costs which the association will incur in reviewing and effectuating the application, in an amount reasonably estimated by the executive board; and

(e) Such other information as *may be reasonably requested* by the executive board.

(3) No subdivision of units shall be effected without the necessary amendments to the declaration, plats, or maps, executed and recorded pursuant to section 38-33.3-217(3) and (5).

(4) All costs and attorney fees incurred by the association as a result of an application shall be the sole obligation of the applicant.

(Emphasis added.)

¶ 26    This language clearly requires an owner to submit an

application to the executive board that includes evidence of

13

compliance with land use regulations, ordinances, and codes, and that includes amendments to the declaration and map clearly identifying the subdivided units.

¶ 27    While courts typically construe the terms "shall" and "must" as mandatory, these phrases are not dispositive in determining whether a statute requires substantial compliance. *See, e.g.*, *Finnnie*, 79 P.3d at 1256 (finding that, under Colorado's governmental immunity statute § 24-10-109(3), C.R.S. 2016, requires only substantial compliance despite the plain language of "shall"); *see also Woodsmall*, 800 P.2d at 67 (concluding that for purposes of governmental immunity substantial compliance is appropriate where the legislative history indicates it did not intend strict compliance). Importantly, the phrases "shall" and "must" are juxtaposed with the phrases "may" and "if," which indicates that other statutory procedures are merely discretionary. *See A.S. v. People*, 2013 CO 63, ¶ 21 ("[T]he legislature's use of the term 'may' is generally indicative of a grant of discretion or choice among alternatives."); *but see Ryan Ranch Cmty. Ass'n, Inc. v. Kelley*, 2016 CO 65, ¶ 42 (holding that where the statute contained the terms

14

"shall" and "must" together and contained no discretionary language, the provisions of CCIOA were considered mandatory).

¶ 28    Further, while the statute states that subdivision will not be effected without corresponding amendments to the declaration or the recorded map, it does not provide any consequence for noncompliance with its other provisions.  This omission, therefore, suggests that the statutory language is discretionary rather than mandatory.  *See In re Marriage of Slowinski*, 199 P.3d 48, 52 (Colo. App. 2008) ("The crucial difference between statutes considered discretionary and those deemed mandatory is the consequence of noncompliance.").  To be sure, the plain language of § 38-33.3-213 indicates that to obtain a subdivision, an applicant "shall" submit an application to the board and amend the map or declaration. But, it is silent about whether a subdivision will be barred when an applicant fails to submit a formal written application or fails to strictly comply with its other provisions.  Accordingly, we turn to other rules of statutory construction — including other provisions of CCIOA and its legislative history — to discern the General Assembly's intent.  *See People v. Terry*, 791 P.2d 374, 376 (Colo. 1990) ("If the statutory language lends itself to alternative

15

constructions and its intended scope is unclear, a court may apply other rules of statutory construction and look to pertinent legislative history to determine which alternative construction is in accordance with the objective sought to be achieved by the legislation.").

¶ 29     First, applying rules of statutory construction, we consider CCIOA as a whole. *See also People v. Dist. Court*, 713 P.2d 918, 921 (Colo. 1986) ("To reasonably effectuate the legislative intent, a statute must be read and considered as a whole."). In doing so, we discern that § 38-33.3-213 does not require consent of the unit owners when an applicant seeks to subdivide.

¶ 30     For example, under CCIOA, amendments to a declaration typically require the approval of at least fifty percent, but not more than sixty-seven percent, of the association members. *See* § 38-33.3-217(1)(a)(I), C.R.S. 2016. In contrast, § 38-33.3-213 is not subject to this voting requirement. This voting exception, therefore, indicates that an applicant's authority to subdivide a unit comes not from the consent of the unit owners, but instead comes directly from the language of the declaration itself. Thus, the absence of this voting requirement shows that the purpose of submitting an

application to the board is to provide it with notice that a unit owner intends to exercise his or her authority to subdivide a unit in accordance with the declaration. It does not constitute a request for such authority.

¶ 31 Moreover, the application serves to assure the board that the subdivision complies with applicable laws and that it will be properly memorialized in the recorded map or declaration. Once recorded, the map then alerts title companies, taxing authorities, and other interested parties of the existence of the new unit.

¶ 32 Because § 38-33.3-213 serves the purpose of providing notice of an owner's intent to subdivide a unit, we conclude the General Assembly intended for applicants to substantially comply with its provisions. *See Wainscott,* ¶ 44 ("[S]ubstantial compliance is well suited for a notice provision that is not jurisdictional."). Moreover, to invalidate a subdivision because of a technical defect in the notice would elevate form over substance. *See, e.g., id.* at ¶ 43 ("A substantial compliance standard also effectuates the specific purpose of the statutory filing and notice requirements by elevating the functional effect of a hospital's effort to provide notice over strict

17

adherence to formal details that may be immaterial under the circumstances.").

¶ 33    This interpretation is consistent with the General Assembly's purpose in enacting CCIOA.  A written summary of the purposes for enacting CCIOA, prepared by the chair of the drafting committee, James Winokur, shows that the General Assembly did not intend rigid or hyper-technical interpretations of the statute.  *See Background and Summary of Basic Provisions*, Hearings on H.B. 1292 before the H. Judiciary Comm., 58th Gen. Assemb., 1st Sess. (Mar. 11, 1991) (report of James L. Winokur, Chair, CCIOA Drafting Committee).  Instead, it aimed to avoid technical defects that would render title unmarketable.  *Id.*  Indeed, the purpose of § 38-33-213 was to "establish reasonable procedures" that would act to simplify the existing law.  *Id.*

¶ 34    Consistent with these legislative goals, the General Assembly incorporated the principles of equity and flexibility into CCIOA.  *See* § 38-33.3-108, C.R.S. 2016 (permitting a court to supplement the statute with the principles of law and equity); *Arrabelle at Vail Square Residential Condo. Ass'n, Inc. v. Arrabelle at Vail Square LLC*, 2016 COA 123, ¶ 60 (same); *see also* Restatement (Third) of Prop.:

18

Servitudes § 6.3 cmt. a (Am. Law Inst. 2000) (noting that, when interpreting statutes governing common interest communities, it is within a court's equitable powers "to fashion remedies to correct mistakes and oversights and to protect the public interest").

¶ 35 Thus, both the statutory scheme and the legislative history demonstrate that, while uniformity is important, statutory interpretations of CCIOA should give way to flexibility where strict adherence to provisions that create uniformity would render title unmarketable.

¶ 36 In sum, we conclude that the purpose of § 38-33.3-213 is to provide the board with notice that a unit owner is exercising his or her subdivision authority under the declaration. For the board to effectively consider an application, it must have adequate information to ensure compliance with land use laws, ordinances, and codes, as well as to ensure the applicant identifies a new unit in a recorded declaration, plat, or map. However, the absence of a specific consequence for strict noncompliance requires that the application be appropriately balanced against CCIOA's broader goals of flexibility and marketability of title. Thus, the information required by the board to ensure compliance will vary depending on

19

the specific subdivision requested. To require strict compliance with the statute could lead to the unreasonable result of rendering title unmarketable because of a technical defect that was otherwise insignificant. Such an interpretation is disfavored and would contravene CCIOA's goals. *See Young v. Brighton Sch. Dist. 27J*, 2014 CO 32, ¶ 11 ("We will not adopt statutory constructions that defeat legislative intent or that lead to unreasonable or absurd results.").

¶ 37 Accordingly, we conclude that because the statutory scheme and legislative history of CCIOA favor flexibility, and because an insubstantial failure to comply with technical requirements should not render title unmarketable, § 38-33.3-213 requires substantial rather than strict compliance with its provisions.

## C. Application

¶ 38 With these conclusions in mind, we address the degree of compliance necessary here. To determine whether there has been substantial compliance with a statute, we consider whether the allegedly complying acts fulfilled the statute's purpose. *Town of La Veta*, 252 P.3d at 1203.

20

¶ 39　　Here, the trial court found that Watson substantially complied with the statute because, as the majority owner and board member of the homeowner's association, any application for subdividing the garage would have been submitted to him for his approval. The trial court recognized that the declaration gave him the authority, as the first purchaser from the grantor, to subdivide the garage. It further noted that most of the provisions of § 38-33.3-213 were inapplicable to the subdivision of a unit creating parking spaces, as subdivision could be accomplished through the simple act of painting lines on the ground of the garage. The trial court found insubstantial errors in the declaration and reformed them to reflect the subdivision of the garage unit.

¶ 40　　We conclude that Watson's status as both property owner and majority-holding board member satisfies the application requirements of § 38-33.3-213(2) and that requiring more formal proof of an application would elevate form over substance. Thus, we reject Perfect Place's argument that the absence of a formal application renders the subdivision void.

¶ 41　　The record also shows that Watson painted dividing lines in the garage to establish three parking spaces. Because neither party

points to any building ordinance or law that Watson violated when he created the parking spaces, we assume Watson was on notice of, and considered whether painting the lines would comply with, all relevant laws. Thus, we conclude that § 38-33.3-213(2)(a) was satisfied.

¶ 42 Next, the record includes the declaration, which contains a subdivision of unit clause that provides for division of the common ownership "in the ratio that the square footage area of each new unit bears to the total square footage area of the original unit," thereby demonstrating the proper allocation of interests. It further shows that the association assessed dues for each parking space based on the size and percentage ownership of each space in accordance with the declaration. This ongoing assessment of dues demonstrates that the association knew the size and percentage ownership of each space. Accordingly, we reject Perfect Place's argument that the subdivision was nullified by the absence of an amendment reallocating interests under § 38-33.3-213(2)(b) and conclude this amendment would have served no purpose, given the clear formula in the declaration and the association's ability to assess dues accordingly. *See Westesen v. Olathe State Bank*, 75

22

Colo. 340, 344, 225 P. 837, 839 (1924) (the law does not require performance of futile acts); *Highlands Ranch Univ. Park, LLC v. Uno of Highlands Ranch*, Inc., 129 P.3d 1020, 1024 (Colo. App. 2005) (same).

¶ 43　　Next, we consider whether the recorded map complies with § 38-33.3-213(2)(c), which states that an amended map should indicate the dimensions of the newly created units "as may be necessary." We note that the recorded map clearly shows the garage divided into three separate units and identifies them as C, D, and E. However, it does not show the dimensions of each parking space. While we acknowledge that the dimensions of each parking space should have been included in the map for clarity of ownership, we nevertheless conclude that, under the circumstances, this failure does not render the subdivision void. Indeed, numerous owners used the spaces without boundary issues for more than a decade. And, the map was sufficient for the association to assess dues for each space, for the City and County of Denver to tax each unit,[5] and for title companies to provide title

---

[5] The declaration provides that the declarant will advise the Assessor of the City and County of Denver of the condominium plan

23

insurance for transfers of ownership by general or special warranty deed. Accordingly, we conclude that the recorded map substantially complied with the requirements of § 38-33.3-213(2)(c) and that the subdivision was not barred by § 38-33.3-213(4).[6]

¶ 44      Because the record shows that Watson testified about his intention to subdivide the garage, that the declaration gave Watson the authority to subdivide the units, and that a map identifying the spaces was recorded consistent with his decision to subdivide the garage, we conclude that Watson substantially complied with the provisions of § 38-33.3-213. To allow Perfect Place to undo more than ten years of board-ratified action through a rigid interpretation of CCIOA would violate the purpose and the spirit of the statute. Absent evidence that Watson's failure to comply with § 38-33.3-213 was anything more than insubstantial, we conclude that he properly divided the garage into three separate parking spaces and affirm the trial court's judgment.

---

"so that each unit shall be deemed a separate parcel of real property and subject to separate assessment and taxation."

[6] Because Perfect Place does not challenge compliance under § 38-33.3-213(2)(d) and (e), C.R.S. 2016, we need not address these provisions. *See Flagstaff Enters. Constr. Inc. v. Snow*, 908 P.2d 1183, 1185 (Colo. App. 1995) (declining to address an issue not properly raised on appeal).

III.     Equitable Remedies

¶ 45     Both parties assert that the trial court abused its discretion in crafting equitable relief.  Perfect Place contends that the court abused its discretion when it (1) reformed the deeds of Watson and Quail Street to validly convey property; (2) found that Watson and Quail Street were alter egos; and (3) voided the 2011 quitclaim deed from Watson to Perfect Place by declaring it a fraudulent conveyance.

¶ 46     Semler contends the trial court abused its equitable discretion when it awarded twenty more inches to space E (and Perfect Place) because, in so doing, the court gave the party with unclean hands a benefit to the detriment of the party with clean hands.  We conclude the trial court did not abuse its discretion in reforming the deeds or in voiding the fraudulent conveyance from Watson to Perfect Place. However, we conclude the court's award of additional area to space E (and Perfect Place) was an abuse of discretion because this equitable remedy benefitted a party with unclean hands.

A.     Standard of Review

¶ 47     Actions to quiet title under C.R.C.P. 105 are equitable proceedings.  *See Keith v. Kinney*, 961 P.2d 516, 518 (Colo. App.

25

1997).  "[T]he power to fashion equitable remedies lies within the discretion of the trial court."  *La Plata Med. Ctr. Assocs., Ltd. v. United Bank of Durango*, 857 P.2d 410, 420 (Colo. 1993).  A trial court's discretion, however, is not unlimited.  *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008), *as modified on denial of reh'g* (Aug. 18, 2008).  We review the trial court's findings of fact for an abuse of discretion, but we review de novo whether the trial court "correctly understood the appropriate test [for the equitable remedy]."  *Id.*

## B.    Deed Reformation

¶ 48    Quiet title actions are governed by C.R.C.P. 105, which authorizes "[a]n action . . . brought for the purpose of obtaining a complete adjudication of the rights of all parties thereto, with respect to any real property and for damages, if any, for the withholding of possession."  C.R.C.P. 105(a).  Such actions sound in equity and are governed by equitable principles.  *FDIC v. Mars*, 821 P.2d 826, 830 (Colo. App. 1991); *Nielsen v. Woods*, 687 P.2d 486, 489 (Colo. App. 1984); *see also Keith*, 961 P.2d at 518 ("Actions to quiet title originated as claims in equity to invalidate claims adverse to the claimant.").  A court considering such a claim is tasked with

26

the equitable duty of "completely adjudicat[ing] the rights of all parties to the action claiming interests in the property" and has substantial discretion in performing this duty. *Keith*, 961 P.2d at 519; *Hildebrand v. Olinger*, 689 P.2d 695, 697 (Colo. App. 1984).

¶ 49 In exercising its discretion, a trial court may be called upon to reform a deed to quiet title. When considering "whether the record supports [a] trial court's order of reformation," a reviewing court "must determine whether the record contains sufficient evidence of the parties' intentions to permit reformation of [the written instrument]." *Md. Cas. Co. v. Buckeye Gas Prods. Co.*, 797 P.2d 11, 13 (Colo. 1990) (citing *Page v. Clark*, 197 Colo. 306, 313, 592 P.2d 792, 796 (1979)); *Page*, 197 Colo. at 313, 592 P.2d at 796 (trial court's factual findings must be upheld on appeal unless so clearly erroneous as to be unsupported by the record). "Reformation of a written instrument is appropriate only when the instrument does not represent the true agreement of the parties and the purpose of reformation is to give effect to the parties' actual intentions." *Md. Cas. Co.*, 797 P.2d at 13.

¶ 50 "[M]utual mistake of fact is [one ground] for reformation," provided that "the mutual mistake does not express the true intent

27

or agreement of the parties." *Segelke v. Kilmer,* 145 Colo. 538, 543, 360 P.2d 423, 426 (1961). "An essential prerequisite to a court's power to reform a contract on the ground of mutual mistake is the existence of a prior agreement that represents the actual expectations of the parties and provides the basis upon which a court orders reformation." *Md. Cas. Co.,* 797 P.2d at 13; *see also Segelke,* 145 Colo. at 543, 360 P.2d at 426 ("[T]he alteration sought to be made . . . must be one to which the parties have earlier assented and which by mistake was either omitted or incorrectly set forth in the final instrument.").

¶ 51    Here, because Watson treated himself and his business entity, Quail Street, as one, title was clouded without reformation of the deeds. Quail Street deeded parking spaces to Watson, who then conveyed them in the name of Quail Street to third parties. The court found, with record support, that because Watson was the sole shareholder of Quail Street, he inadvertently deeded parking spaces from Quail Street that should have been from him, and deeded spaces from him that should have been deeded from Quail Street. It also found that Watson relied on title companies to ensure that he was deeding the properties from the correct entity, and, thus,

28

any conveyance errors were inadvertent. Therefore, the trial court reformed the deeds from Watson and Quail Street to reflect transfers from the correct entity.

¶ 52    We discern no abuse of discretion. Consistent with the trial court's actions, a division of this court has noted that a proper basis for reformation arises when both parties mistakenly believe that a deed identified the correct owner or grantor. *See Ranch O, LLC v. Colo. Cattlemen's Agric. Land Tr.*, 2015 COA 20, ¶¶ 17-21 (holding that reformation of a conservation deed to reflect that the actual owner of the property, an LLC, was the grantor of the conservation easement was proper given that both parties "mistakenly believed that it correctly identified the grantor and that the grantor had the authority to convey the conservation easement"). Further, the trial court's factual findings are supported by the record. Accordingly, because the record shows Watson mistakenly conveyed the parking spaces in his and Quail Streets' names, and because other parties could have reasonably believed he was the correct signor for either Quail Street or himself, the trial court did not abuse its discretion in reforming the deeds.

## C.    Alter Egos

¶ 53 Because we conclude that the trial court did not abuse its discretion in reforming the deeds based on a theory of mutual mistake, we need not address whether the court properly found Quail Street and Watson to be alter egos. *See Blood v. Qwest Servs. Corp.*, 224 P.3d 301, 329 (Colo. App. 2009) (noting that the court of appeals can affirm on any grounds supported by the record).

### D.    Deed Voided by Fraud

¶ 54 Perfect Place contends that the trial court abused its discretion by finding that the 2011 quitclaim deed from Watson to Perfect Place was an invalid instrument because its conveyance involved fraudulent misrepresentations.  Specifically, Perfect Place contends that Semler lacks standing to challenge the validity of the 2011 quitclaim deed, and further contends that even if it was procured by fraud, the deed would be voidable, not void, under the law.  Semler responds that the record supports the trial court's finding that Perfect Place's attorney misrepresented the circumstances surrounding the 2011 quitclaim deed and, thus, that this deed is void.

¶ 55 For the reasons stated below, we conclude that the trial court properly voided the quitclaim deed by finding that the

circumstances surrounding the conveyance were fraudulent. Further, because this is a C.R.C.P. 105 proceeding, where the rights of all interested parties must be adjudicated, Semler has standing to assert that his title to the parking spaces is superior to Perfect Place's title under the theory that Perfect Place's title was procured by fraud.

### 1.    Standing

¶ 56    We first address Perfect Place's standing argument and conclude that Perfect Place mistakenly confuses the trial court's finding of a fraudulent conveyance with a finding of fraud. Indeed, Semler did not plead fraud, nor did the court enter judgment on or award damages for a claim of fraud. But he need not plead fraud in order to assert a legal right to the parking spaces that was superior to Perfect Place's right. Under the circumstances here, Semler's superior right was based on the theory that Perfect Place obtained title through a fraudulent conveyance, and the court was required, under C.R.C.P. 105(a), to fully adjudicate the rights of all interested parties. "Even if a counterclaim is not pled, or an issue is not raised in the pleadings but is apparent from the evidence, the court

31

should reach the issue to give full relief." *Keith,* 961 P.2d at 519. Accordingly, we reject Perfect Place's standing argument.

## 2. Deed Voided for Fraud

¶ 57    Colorado courts have consistently recognized the important distinction between a void deed and a deed that is merely voidable. *See Delsas v. Centex Home Equity Co.*, 186 P.3d 141, 144 (Colo. App. 2008); *see also Upson v. Goodland State Bank & Tr. Co.*, 823 P.2d 704, 705 (Colo. 1992); *Svanidze v. Kirkendall,* 169 P.3d 262, 266 (Colo. App. 2007). "A void deed is a nullity . . . from the beginning, for any purpose" and "does not, and cannot, convey title, even if recorded." *Delsas,* 186 P.3d at 144. "In contrast, a voidable deed conveys property and creates legal title unless, and until, it is set aside by the court." *Id.* Thus, a good faith purchaser asserting an ownership interest under a voidable deed will be protected. *Id.*

¶ 58    In Colorado, a deed procured by "fraud in the factum" is void. *Id.* "Fraud in the factum" exists when "a person has been fraudulently deceived about the nature of a document, so that he or she is excusably ignorant about what has been signed." *Id.* (citation omitted). *Compare id.* at 145 (finding a material issue of fact existed about whether a warranty deed was void for "fraud in the

32

factum" where the grantees "took advantage of [the grantor's] . . . incapacity and misled him about the nature of the warranty deed to the point that he was ignorant about what he had signed"), *with Deutsche Bank Tr. Co. Ams. v. Samora*, 2013 COA 81, ¶¶ 44-46 (refusing to find "fraud in the factum" where a grantee understood that the document she signed was a warranty deed and, thus, was not excusably ignorant about the nature of the document, but believed the grantor's fraudulent misrepresentations about how the deed would be used). Unlike other types of fraud, "fraud in the factum" yields an instrument that is void, not merely voidable. *Delsas*, 186 P.3d at 144.

¶ 59    Here, the record supports the trial court's finding that the 2011 quitclaim deed from Watson to Perfect Place was a fraudulent conveyance. Watson believed that the quitclaim deed merely corrected a technical defect in title from an earlier conveyance and told Perfect Place's attorney, "I don't own anything there. I haven't for years. I sold it all a long time ago."

¶ 60    Additionally, Perfect Place's attorney fostered Watson's belief that the deed was intended only to correct technical defects by representing that Perfect Place lawfully owned all three parking

spaces when he knew title problems existed. Moreover, when Watson asked to see the title commitments before signing the deed, Perfect Place's attorney said he was reluctant to send them because they contained issues of other owners. Watson confirmed that he would not have signed the 2011 quitclaim deed if he had known that Perfect Place did not have a valid claim to the parking spaces.

¶ 61    Accordingly, we conclude the record supports the trial court's finding that the quitclaim deed was obtained by fraud and specifically by "fraud in the factum." Because a deed obtained by "fraud in the factum" is void, *Delsas,* 186 P.3d at 144, we need not address the distinction between a void and a voidable deed and, therefore, affirm the court's finding of a fraudulent conveyance.

### E.    Amendment of the Declaration Map

¶ 62    Semler contends that the trial court abused its discretion when it increased the size of space E at the expense of his space D, thereby benefitting Perfect Place, a party it had found to have unclean hands. We agree and conclude that although the court retains broad discretion in determining matters of equity, it may not award equitable relief to benefit a party with unclean hands.

#### 1.    Unclean Hands

34

¶ 63    A party requesting equitable relief must do so with clean hands. *Salzman v. Bachrach*, 996 P.2d 1263, 1269 (Colo. 2000). Conversely, a party requesting equitable relief may raise unclean hands as a defense to equitable remedies. *Wilson v. Prentiss*, 140 P.3d 288, 293 (Colo. App. 2006). Whether the doctrine applies is within the discretion of the trial court. *Hildebrand*, 689 P.2d at 697; *see also Prentiss*, 140 P.3d at 293. The clean hands doctrine is informed by public policy and is thus intended to protect the integrity of the court. *Premier Farm Credit, PCA v. W-Cattle, LLC*, 155 P.3d 504, 520 (Colo. App. 2006). Thus, Colorado law adheres to the maxim that "equity *refuses* to lend its aid to a party who has been guilty of unconscionable conduct in the subject matter in litigation." *Id.* at 519 (emphasis added) (citation omitted).

¶ 64    Whether a party acted with unclean hands is a question of fact. *Id.* at 520. Because equitable matters are entirely discretionary, it is within the trial court's discretion not only to determine whether sufficient facts support a finding of unclean hands, but also to decide whether to grant equitable relief. *Id.* Accordingly, the court's decision whether to invoke the unclean hands doctrine is reviewed for an abuse of discretion. *See id.* A

35

trial court abuses its discretion if its decision is manifestly unreasonable, arbitrary, or unfair. *See Schneider v. Drake*, 44 P.3d 256, 261 (Colo. App. 2001). In assessing whether a court abused its discretion, a reviewing court must consider whether the trial court's decision fell within in a range of reasonable options. *E-470 Pub. Highway Auth. v. Revenig*, 140 P.3d 227, 230-31 (Colo. App. 2006).

## 2. Analysis

¶ 65 As noted, C.R.C.P. 105 requires the trial court to adjudicate all matters and afford the parties complete relief. Thus, a trial court may properly amend boundaries in a declaration map as part of its equitable power under this rule. Here, however, the trial court explicitly found that Perfect Place came to court with unclean hands concerning its claim to the parking spaces, including space E. This finding, therefore, precluded the court not only from adding square footage to space E, but also from removing square footage from space D. Accordingly, the trial court's amendment resulted in bestowing an unfair benefit to Perfect Place, the party with unclean hands, and an unfair detriment to Semler, contrary to law. *See Salzman*, 996 P.2d at 1269 (finding that a party's unclean hands

36

should limit his relief unless the other party benefitted more from the deception).

¶ 66     The trial court's amendment of the map was also manifestly unreasonable.  The record demonstrates that space E had always been a smaller space than spaces C and D.  Indeed, Watson testified that space E was "exceptionally small," and "motorcycle width."  The trial court noted that space E should be smaller than spaces C and D, not only based on the historical boundaries, but also based on its finding that the balance of equities weighed in favor of Semler.  Yet, inexplicably, it adopted dimensions contrary to these findings that resulted in space E receiving thirty-two square feet more space than it was originally allotted and space D receiving eighteen square feet less space than it was originally allotted.  The trial court's amendment contradicted its findings and was therefore manifestly unreasonable.

¶ 67     Finally, the trial court's establishment of the parking space boundary lines was arbitrary.  The record reflects that as early as 2002, painted lines marked the boundaries between each parking space.  Indeed, the trial court found that "Watson went to the parking garage and physically marked off the separate parking

37

spaces which are still discernible today." We acknowledge that the record is unclear concerning the precise historical boundaries of the spaces. However, the trial court's finding that the original boundaries were still visible, coupled with its finding that space E was always smaller than spaces C and D, compels us to conclude that the map's current dimensions are not supported by the record and are therefore arbitrary.[7]

¶ 68 Accordingly, we conclude that while the trial court had broad discretion to order equitable relief, it abused its discretion when it amended the map in favor of the party with unclean hands and when it adopted boundaries contrary to the evidence in the record. We reverse the trial court's boundary findings and remand the case for redetermination of the boundary lines consistent with their historical dimensions.

### IV.      Resulting Chain of Title

¶ 69 Both Perfect Place and Semler claim superior title to the parking spaces. Thus, we review the chain of title to each space

---

[7] We also note that the dimensions for space E in the recorded "Parking Space Lease Agreement" executed between Perfect Place and Nathan and Kari Peters are smaller than those in the map the trial court adopted in its final order.

based on the deeds in the record, including the trial court's reformations.

## A. Standard of Review and Law

¶ 70 Interpretation of a written document presents a question of law subject to de novo review. *See Bolser v. Bd. of Comm'rs*, 100 P.3d 51, 53 (Colo. App. 2004); *Collins v. Colo. Mountain Coll.*, 56 P.3d 1132, 1135 (Colo. App. 2002). In construing a deed, a court's paramount purpose is to ascertain the parties' intent. *Notch Mountain Corp. v. Elliott*, 898 P.2d 550, 557 (Colo. 1995). "We must not ascertain intent from 'portions presented in isolated sentences and clauses,' but from the deed as a whole." *Michaelson v. Michaelson*, 939 P.2d 835, 839 (Colo. 1997) (quoting *Notch Mountain Corp.*, 898 P.2d at 557); *see Percifield v. Rosa,* 122 Colo. 167, 177, 220 P.2d 546, 551 (1950); *Bolser*, 100 P.3d at 53.

¶ 71 The plaintiff in a quiet title action has the burden of establishing title superior to that claimed by the defendant. *Hutson v. Agric. Ditch & Reservoir Co.*, 723 P.2d 736, 738 (Colo. 1986); *see also Hinojos v. Lohmann,* 182 P.3d 692, 697 (Colo. App. 2008). Thus, the plaintiff may not capitalize on the weakness of the defendant's claim to title, but can only succeed by establishing the

39

strength of his or her own claim to title. *Sch. Dist. No. Six v. Russell*, 156 Colo. 75, 82, 396 P.2d 929, 932 (1964); *Fastenau v. Engel*, 129 Colo. 440, 443-45, 270 P.2d 1019, 1020-21 (1954). Accordingly, if the facts fail to show that the plaintiff has title, he or she may not attack the sufficiency of the evidence on which the court adjudged title to be in the defendant. *Hinojos*, 182 P.3d at 697.

## B. Parking Space C

¶ 72  Watson or Quail Street first conveyed spaces C and D to Aspen Equestrian for valuable consideration in a warranty deed recorded on July 24, 2004. Aspen Equestrian conveyed space C to Corey Salankey by a special warranty deed recorded on July 28, 2006. The public trustee foreclosed on space C on October 16, 2007. During the redemption period, Semler paid the balance of Salankey's loan and received title to space C on January 20, 2008. The record does not reflect any subsequent conveyance of space C. *See infra* Appendix 1.

## C. Parking Space D

¶ 73  Aspen Equestrian conveyed space D to Shanoah Blake by a special warranty deed recorded on September 27, 2006. Blake

conveyed space D to Semler in a deed in lieu of foreclosure and in a quitclaim deed recorded on August 12, 2012.

¶ 74     In a wild deed,[8] Jay Weinberg purported to convey space D to Trend Investments in a special warranty deed recorded on March 13, 2009. Weinberg was the principal and sole shareholder of Trend Investments. On the same day, Trend Investments conveyed space D to Newtown Ten (of which Weinberg was the principal and sole shareholder) by special warranty deed. However, the deed recorded on March 19, 2009, purported to convey space "D and/or E" to Perfect Place (from Newtown Ten) by a quitclaim deed for ten dollars consideration. *See infra* Appendix 2.

¶ 75     We conclude that Semler's title to space D is superior to Perfect Place's title for three reasons. First, Perfect Place's title stems from a wild deed beginning with Weinberg, who thereafter conveyed title to two entities he owned before finally conveying title to Perfect Place. Second, Perfect Place's receipt of a quitclaim deed for ten dollars called into question Perfect Place's status as a bona fide purchaser for value. *See In re Marriage of Allen*, 724 P.2d 651,

---

[8] *See Ranch O, LLC v. Colo. Cattlemen's Agric. Land Tr.*, 2015 COA 20, ¶¶ 29-32 (stating that a wild deed is "a deed in which the grantor was a stranger to title").

659 (Colo. 1986) (holding that to become a bona fide purchaser a party must also give adequate consideration, or value, to gain legal and equitable title). Finally, Perfect Place was not a bona fide purchaser because it had constructive notice, through Blake's recorded 2006 deed, that Newtown Ten had no legal title to space D. *See Ranch O, LLC*, ¶ 30 (stating that the purpose of Colorado's race-notice statute is "to protect purchasers of real property against the risk of prior secret conveyances by the seller and to allow a purchaser to rely on the title as it appears of record"); *see also Franklin Bank, N.A. v. Bowling*, 74 P.3d 308, 313 (Colo. 2003) ("When a party properly records his interest in property with the appropriate clerk and recorder, he constructively notifies 'all the world' as to his claim.").

¶ 76    In contrast, Semler received title to space D directly from Blake's recorded deed and had no notice of either Trend Investments' or Newtown Ten's conveyances to Perfect Place. *Collins v. Scott*, 943 P.2d 20, 22 (Colo. App. 1996) (holding that recording a deed is "notice only to those persons claiming under the same chain of title who are bound to search for it" and that "[d]ocuments outside the chain of title provide no notice unless a

possible irregularity appears in the record which indicates the existence of some outside interest by which the title may be affected"). Further, unlike Perfect Place, Semler paid valuable consideration for his deed, making him a bona fide purchaser for value. Accordingly, we conclude that Semler's title to space D is superior to Perfect Place's title. *Guar. Bank & Tr. Co. v. LaSalle Nat'l Bank Ass'n,* 111 P.3d 521, 523 (Colo. App. 2004) (noting that Colorado's recording statute will "protect bona fide purchasers without notice, or anyone who in good faith and without notice of a prior unrecorded deed or other instrument acquires a lien or encumbrance on the same tract of land").

### D.    Parking Space E

¶ 77    While neither party explicitly challenges Perfect Place's ownership of space E, we note that some of our findings necessarily affect space E's title. As previously discussed, the trial court found that the 2011 quitclaim deed did not validly convey title in space E to Perfect Place. Rather, the trial court found that Perfect Place owned space E by an agreement of the parties that was based on a pretrial settlement between Perfect Place and Nathan and Kari

Peters.[9] Thus, we do not address space E's chain of title here. Because the legality of space E's ownership is not before us, this opinion should not be construed as approving ownership of space E in any party.

## V. Attorney Fees

¶ 78 Semler requests attorney fees on appeal and contends the trial court erred when it denied his motion for attorney fees and costs at trial. Perfect Place contends that Semler is not entitled to attorney fees because it did not bring this action under CCIOA. We conclude that Semler should be awarded trial and appellate attorney fees because he was required to "defend" his title under the provisions of CCIOA.

¶ 79 Section 38-33.3-123(1)(c), C.R.S. 2016, provides:

> In any civil action to enforce or *defend* the
> provisions of this article or of the declaration,

---

[9] We note that parties cannot stipulate to ownership of property to which they have no valid title. *In re Estate of Masden*, 24 P.3d 634, 636 (Colo. App. 2001) (finding that a stipulation between parties will not resolve an ownership dispute if all parties with an ownership interest have not received notice and an opportunity to participate); *see also Dillon, Read & Co. v. United States*, 875 F.2d 293, 300 (Fed. Cir. 1989) ("The parties are free to stipulate to whatever facts they wish, except they may not stipulate to facts known to be fictitious. The trial court has a duty to reject stipulations which are demonstrably false.").

> bylaws, articles, or rules and regulations, the
> court shall award reasonable attorney fees,
> costs, and costs of collection to the prevailing
> party.

(Emphasis added.) Thus, under this statute, a prevailing party in a CCIOA dispute is entitled to attorney fees. *See Hallmark Bldg. Co. v. Westland Meadows Owners Ass'n, Inc.*, 983 P.2d 170, 174 (Colo. App. 1999).

¶ 80    Both in the trial court and on appeal, Perfect Place argued that the garage was not properly subdivided under the provisions of CCIOA and, thus, that Semler never received valid title to the parking spaces. Semler was required, therefore, to defend his title under CCIOA. Because we conclude that the garage was properly subdivided under § 38-33.3-213, we award Semler reasonable attorney fees as the prevailing party. *Id.* (holding that a prevailing party in a case involving both CCIOA claims and other statutory claims for relief was entitled to attorney fees under § 38-33.3-123(1)). The case is remanded to determine and award Semler his reasonable trial and appellate attorney fees. *See* C.A.R. 39.1.

## VI. Conclusion

¶ 81    We affirm the trial court's judgment quieting title to spaces C and D in Semler.  We reverse the trial court's judgment adjusting the boundaries of spaces D and E.  We remand the case for further proceedings under C.R.C.P. 105 with respect to space E and direct the trial court to return the boundaries of spaces D and E to their historical dimensions.  We also direct the trial court on remand to determine and award Semler his reasonable trial and appellate attorney fees.

JUDGE ROMÁN and JUDGE LICHTENSTEIN concur.

# APPENDIX 1

C's Chain of Title

1940 Blake Street Corp.

March 31, 2000
Quail Street Co.
**Spaces C,D,E**
For Value

As reformed

March 1, 2002
John Watson
**Space C**
Quitclaim Deed
for $0



**- - - -** = Court Reformation

Unless otherwise noted, dates reflect the date the deed was recorded, not the date the deed was executed.

July 26, 2004
Aspen Equest.
**Space C**
Warranty Deed
For Value

Sept. 15, 2006
Corey Salankey
**Space C**
Special Warranty
For Value

Oct. 19, 2007
Public Trustee
**Space C**
Certificate of
Purchase
(foreclosure)

Jan. 30, 2008
Parker Selmer
Redemption of
Foreclosure
**Space C**
For Value

Jan. 30, 2008
Parker Selmer
Deed from
Redemption
**Space C**

# Deeds Outside of C's Chain of title



March 31, 2000
Quail Street Co.
**Spaces C,D,E**
For Value

June 14, 2011
Perfect Place
**Space C**
Quitclaim Deed
for $10

June 5, 2013
Perfect Place
**Space C**
Quitclaim  Deed
for $10



July 26, 2004
Aspen Equest.
**Space C**
Warranty Deed
For Value

Oct. 21, 2013
(Executed 8/24/12)
Parker Semler
**Space C**
Deed in Lieu of
Foreclosure For
Value and a
Quitclaim Deed
For $10

Oct. 12, 2006
Shanoah Blake.
**Space C**
Special Warranty
Deed
For Value

A shaded space indicates an invalid conveyance

# APPENDIX 2
## D's Chain of Title



**- - - -** = Court Reformation

Unless otherwise noted, dates reflect the date the deed was recorded, not the date the deed was executed.

1940 Blake Street Corp.

March 31, 2000
Quail Street Co.
**Spaces C, D, and E**
For Value

As reformed

March 1, 2002
John Watson
**Space D**
Quitclaim Deed for $0

July 26, 2004
Aspen Equest.
**Space D**
Warranty Deed
For Value

Oct. 12, 2006
Shanoah Blake.
**Space D**
Special Warranty Deed
For Value

Oct. 21, 2013
(executed August 24, 2012)
Parker Semler
**Space D**
Deed in Lieu of Foreclosure For Value and a Quitclaim Deed For $10

# Deeds Outside of D's Chain of title



March 31, 2000
Quail Street Co.
**Spaces C, D, and E**
For Value

June 14, 2011
Perfect Place
**Space D**
Quitclaim Deed
for $10

June 5, 2013
Perfect Place
**Space D**
Quitclaim Deed
for $10

A shaded space indicates an invalid conveyance

Jay Weinberg
**Note:** No prior deed in the record conveys him ownership.

March 31, 2009
(executed 3/13)
NewTown Ten
**Space E**
(crossed out D and handwrote E)
Quitclaim $10

March 26, 2009
(executed 3/13)
Trend Investments
**Space D**
Special Warranty Deed
For $10

March 13, 2009
Perfect Place
**Space D and/or E**
Quitclaim Deed
For $10

March 26, 2009
(Executed 3/13)
NewTown Ten
**Space D**
Special Warranty Deed
For Value