Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us.  Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

**2018 CO 74**

**No. 17SC115, <u>Perfect Place v. Semler</u> — Common Interest Communities — Quieting Title — Deeds.**

In this quiet title action, the supreme court reviews whether the owner of a garage condominium unit validly subdivided the unit under section 38-33.3-213, C.R.S. (2018) of the Colorado Common Interest Ownership Act by merely painting or marking lines on the garage wall, and thereafter separately conveying the spaces thus marked as individual condominium parking units.  Because section 38-33.3-213(3) provides that "no subdivision of units shall be effected" without executing and recording the necessary amendments to the condominium declaration, and because no documents were recorded in connection with his purported subdivision, the supreme court holds that the owner did not accomplish a valid subdivision of the garage unit in this case. The supreme court further holds that a quitclaim deed obtained from the owner was not void for fraud in the factum.  Although evidence in the record suggests the owner may have been deceived as to the purpose of the deed, fraud in the factum requires proof that the grantor was ignorant as to the nature of the instrument itself.  Here the owner understood that he was signing a quitclaim deed, even if he failed to appreciate

the ramifications of his act.  Accordingly, the court reverses the judgment of the court of appeals and remands the case for further proceedings to determine the resulting chain of title for the disputed parking units.

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2018 CO 74

**Supreme Court Case No. 17SC115**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 15CA918

**Petitioner:**

Perfect Place, LLC, a Colorado limited liability company,

v.

**Respondent:**

R. Parker Semler.

**Judgment Reversed**
*en banc*
September 17, 2018

**Attorneys for Petitioner:**
Mary Ewing Law Offices, PC
A. Craig Fleishman
        *Englewood, Colorado*

**Attorneys for Respondent:**
Semler & Associates, P.C.
R. Parker Semler
Andrew Oh-Willeke
Jeremy Goldblatt
        *Denver, Colorado*

**JUSTICE MÁRQUEZ** delivered the Opinion of the Court.

¶1     This quiet title action requires us to determine whether the owner of a garage condominium unit can validly subdivide that unit under section 38-33.3-213, C.R.S. (2018) of the Colorado Common Interest Ownership Act ("CCIOA") by merely painting or marking lines on the garage wall, and thereafter separately convey the spaces thus marked as individual condominium parking units.  Petitioner Perfect Place, LLC ("Perfect Place") asserts ownership of three parking spaces (spaces "C, D, and E") in a mixed-use residential and commercial building located at 1940 Blake Street, Denver, Colorado (the "Building").  Respondent R. Parker Semler contends that he owns spaces C and D.

¶2     According to the declaration in the record before us, the Building consists of twelve condominium units.  These condominium units consist of ten apartments and offices, and two vehicle parking units located in the Building's garage.  As listed in the declaration, Unit G—C/D/E (the "Garage Unit") is a single 400-square-foot vehicle parking unit containing three parking spaces: C, D, and E.[1]  The dimensions of these parking spaces are not marked or otherwise discernible from the declaration or accompanying map.

---

[1] Although a "condominium unit" typically refers to a residential apartment unit that is part of a common interest community, under CCIOA, the term may also describe vehicle parking units in common interest communities, such as the Garage Unit in this case.  See § 38-33.3-103(30), C.R.S. (2018).

¶3 In 2000, Quail Street Company ("Quail Street") obtained a majority of the Building's condominium units, including the Garage Unit, from the original owner. Quail Street's manager and sole shareholder, John Watson, later physically marked the boundaries of spaces C, D, and E with paint or tape, purportedly subdividing the Garage Unit into three individual units that could be separately conveyed. However, there is no evidence that Watson ever recorded any amendment to the declaration reflecting the subdivision of the Garage Unit, as required by section 38-33.3-213 of CCIOA, which governs the subdivision of units. Watson later transferred his interests in spaces C and D to different buyers; those buyers later transferred their interests to others, including Semler.

¶4 In June 2013, Perfect Place filed a quiet title action, asserting superior title to spaces C, D, and E based on a quitclaim deed it obtained from Watson in 2011 (the "2011 Quitclaim Deed") that purportedly conveyed the Garage Unit as a single, undivided condominium unit. Although the individual spaces C, D, and E had been conveyed to other owners, Perfect Place contended that these conveyances were invalid because Watson had never validly subdivided the Garage Unit. Perfect Place thus claimed title to all three parking spaces, contending that the 2011 Quitclaim Deed it obtained from Watson was the only valid conveyance of the Garage Unit.

¶5 In response, Semler asserted that the Garage Unit had been properly subdivided into separate units. Semler claimed superior title to spaces C and D based on deeds that conveyed these spaces to him as individual units. He further argued that Perfect Place obtained the 2011 Quitclaim Deed from Watson through fraudulent misrepresentations.

3

¶6    After a three-day bench trial, the trial court held that the Garage Unit was properly subdivided into three units, either because the Building's original owner had already subdivided the Garage Unit at the time it filed the declaration, or because Watson validly subdivided the Garage Unit by physically marking off the separate spaces. The court further held that the 2011 Quitclaim Deed was procured through fraud and unclean hands, and that Semler was the rightful owner of parking spaces C and D. The court ordered that the declaration be amended to reflect that the condominium was divided into fourteen units and adopted an amended map depicting the boundaries of the parking spaces C, D, and E. Relevant here, the map adopted by the court attempted to make space E more usable by enlarging it, which reduced the size of space D. The court denied Semler's request for attorney fees.

¶7    Perfect Place appealed the trial court's judgment as to the ownership of spaces C and D. Semler cross-appealed the trial court's enlargement of space E at the expense of space D and the trial court's denial of his request for attorney fees.

¶8    In a unanimous published decision, the court of appeals affirmed the trial court's conclusion that the Garage Unit was properly subdivided and that Semler owned spaces C and D. Perfect Place v. Semler, 2016 COA 152M, ¶ 2, ___ P.3d ___, as modified on denial of reh'g (Jan. 12, 2017). Relevant here, the court of appeals held that section 38-33.3-213 of CCIOA governing the subdivision of condominium units required only substantial compliance, and that Watson substantially complied with these provisions and therefore accomplished a valid subdivision of the Garage Unit. Id. at ¶¶ 1, 22–44. The court of appeals further determined that the trial court properly declared the 2011

4

Quitclaim Deed void, because Perfect Place procured it by "fraud in the factum" by misrepresenting to Watson that the deed was intended merely to correct technical defects in title. Id. at ¶¶ 57–61. However, the court of appeals held that the trial court erred by enlarging the size of space E and also denying Semler's request for attorney fees. Id. at ¶¶ 2, 68, 81. We granted Perfect Place's petition for writ of certiorari.[2]

¶9    Under the plain language of section 38-33.3-213(3), "no subdivision of units shall be effected" without executing and recording the necessary amendments to the condominium declaration, plats, or maps pursuant to section 38-33.3-217(3) and (5), C.R.S. (2018) of CCIOA. Because there is no evidence that Watson caused any documents

---

[2] We granted certiorari to review the following issues:

1. Whether a garage condominium unit can be subdivided into individual units by painting lines on the garage wall, while ignoring the statutory procedure for subdivision required by the Colorado Common Interest Ownership Act ("CCIOA"), sections 38-33.3-101 to 402, C.R.S. (2018), and then conveyed as separate condominium units.

2. Whether the Court of Appeals erred in declaring a deed void as a "fraudulent conveyance" based upon a misrepresentation to the grantor, where the grantor had not challenged the deed, was not a party to the suit, and had subsequently ratified the deed.

3. Whether the Court of Appeals can re-balance equities between the parties in determining the dimensions of a parking space.

4. [REFRAMED] Whether the Court of Appeals erred in holding—in a manner that conflicts with Platt v. Aspenwood Condo. Ass'n, Inc., 214 P.3d 1060, 1068 (Colo. App. 2009)—that a prevailing party in any dispute impacted by the principles of CCIOA is entitled to attorney fees.

to be filed or recorded in connection with his purported subdivision, we hold that Watson did not accomplish a valid subdivision of the Garage Unit.

¶10    We further hold that the court of appeals erred in concluding that the 2011 Quitclaim Deed was void for fraud in the factum. Although evidence in the record suggests that Watson may have been deceived as to the purpose of the 2011 Quitclaim Deed, fraud in the factum requires more—namely, proof that the grantor was ignorant as to the nature of the instrument itself. Here, the evidence reflects that Watson understood he was signing a quitclaim deed, even if he did not appreciate the ramifications of his act. Thus, the deed is voidable, but not void.

¶11    In light of our holdings that Watson did not accomplish a valid subdivision of the Garage Unit and that the 2011 Quitclaim Deed was improperly declared void for fraud in the factum, remand is necessary to determine the resulting chain of title for the disputed parking spaces. We decline to consider the remaining issues on which we granted certiorari review, as these issues cannot be decided in this case without first resolving the chain of title for these spaces.

¶12    Accordingly, we reverse the judgment of the court of appeals and remand for further proceedings consistent with this opinion.

## I.  Facts and Procedural History

¶13    In June 1993, 1940 Blake Street Corporation dedicated the Building to condominium ownership by recording a written declaration (the "Declaration"). The Declaration established twelve condominium units. Ten of these units are apartments and offices; the remaining two are vehicle parking units located in the Building's garage.

6

The Garage Unit is depicted in the list of condominium units and on the map accompanying the declaration as a single 400 square-foot vehicle parking unit containing three parking spaces: C, D, and E. Neither the declaration nor the map identifies the boundaries or dimensions of these parking spaces.

¶14     Section 4.7 of the Declaration provides that the Declarant (1940 Blake Street Corporation) or a subsequent owner may divide any condominium unit by filing a supplement to the Declaration and the map.[3]  If a unit is divided, section 4.7 requires that the percentage interest of ownership in common elements allocated to the original unit shall be divided among the new separate units in proportion to the square footage the new unit bears to the square footage of the original unit.  Section 15.2 of the Declaration provides that "[e]ach Owner shall comply strictly with the provisions of this Declaration," and section 15.6 provides that no amendment of the Declaration shall be effective until it is recorded.

¶15     In March 2000, 1940 Blake Street Corporation conveyed nearly all of the condominium units in the Building, including the Garage Unit, to Quail Street by warranty deed.  At all relevant times, Quail Street's manager and sole shareholder was John Watson.  At some point after the Garage Unit was conveyed to Quail Street, Watson

---

[3] Section 4.7 of the Declaration provides that once a unit has been subdivided, "all rights further to divide such Unit or any part thereof shall terminate."

7

painted or marked with tape the boundaries for parking spaces C, D, and E.[4] Spaces C and D were marked as normal-sized parking spaces; Space E was marked as a smaller space, such as for a motorcycle. There is no evidence in the record that Watson ever filed or recorded any documents in connection with his physical marking of the boundaries of the parking spaces.

¶16     In February 2002, Watson caused Quail Street to execute a quitclaim deed that purportedly conveyed "Unit G—C/D" to himself. Watson then transferred his interests in spaces C and D to different buyers; in some of these transactions, it was unclear whether Watson was acting in his individual capacity or on behalf of Quail Street. Those who initially purchased from Watson later transferred their interests to others. Over the years, the City and County of Denver taxed each space (C, D, and E) individually, the Building's condominium association assessed dues for each space individually, and title insurance companies separately insured each space.

¶17     In January 2008, Semler obtained and recorded a public trustee's deed that purportedly conveyed title to space C. Semler also obtained a deed in lieu of foreclosure that purportedly conveyed title to space D; this deed was executed in August 2012 and recorded in October 2013.

---

[4] We assume, as we believe the court of appeals did, that when Watson attempted to subdivide the Garage Unit, he was acting on behalf of Quail Street, which had subdivision rights under section 4.7 of the Declaration as a subsequent buyer of the Garage Unit.

¶18    Meanwhile, in June 2011, Perfect Place's lawyer contacted Watson regarding an apparent title defect with respect to spaces C, D, and E.  In a letter to Watson, the lawyer asserted that Perfect Place is "supposed to own" spaces C, D, and E, but that its title "needed to be perfected by a quitclaim deed from [Watson]."  The letter further stated that "there is a question as to whether or not [Watson's] title was even good when [he] got it" and that signing a quitclaim deed would "solve[] [Watson's] participation in anything to do with [the Building.]"  The lawyer represented that "through this quitclaim deed you are not warranting that you have any title whatsoever at [the Building] but if it turns out that you do have any lingering mistaken interest then you are conveying it to [Perfect Place]."

¶19    Shortly after this communication, Perfect Place and Watson executed and recorded a quitclaim deed (the 2011 Quitclaim Deed).  This deed purportedly conveyed "Unit G— c/d/e ," also known as "Parking space C/D/E," to Perfect Place in exchange for $10.[5]

¶20    Watson stated in his deposition that he believed the 2011 Quitclaim Deed was intended to correct technical defects regarding title for the three spaces.  He denied that it was his intention to "actually transfer" the parking spaces through the 2011 Quitclaim Deed, adding that the spaces were worth about $50,000 each when he originally sold them.  Rather, he was "just trying to correct a title defect as a courtesy."  He further stated

---

[5] Watson later executed a "Correction Quit Claim Deed" to correct a "typographical error in the name of the condominium project referenced in the legal description" contained in the 2011 Quitclaim Deed.

that, at the time he signed the 2011 Quitclaim Deed, he did not believe that he owned any interest in any of the parking spaces because he "had already sold and been paid for parking spaces."

¶21 In June 2013, Perfect Place filed a quiet title action, asserting superior title to spaces C and D based on the 2011 Quitclaim Deed it obtained from Watson. (At trial, the parties stipulated that Perfect Place owns space E.) Perfect Place contended that all conveyances of the parking spaces as individual units had no legal effect because the Garage Unit was never validly subdivided. Relevant here, CCIOA provides that "[i]n order to subdivide a unit, the unit owner of such unit . . . must submit an application to the executive board [of the condominium association]," and that "[n]o subdivision of units shall be effected without the necessary amendments to the declaration, plats, or maps, executed and recorded pursuant to section 38-33.3-217(3) and (5)." § 38-33.3-213(2), (3) C.R.S. (2018). Because Watson failed to follow these statutory requirements when he purportedly divided the Garage Unit into three separate condominium units—by simply marking boundaries for the individual spaces—Perfect Place argued that the Garage Unit was never validly subdivided and that each subsequent conveyance of space C, D, or E as an individual unit was therefore invalid. Consequently, Perfect Place claimed, the only valid conveyance involving the parking spaces after 1940 Blake Street conveyed the Garage Unit to Quail Street in March 2000 was Watson's conveyance of the Garage Unit—as a single condominium unit—to Perfect Place through the 2011 Quitclaim Deed.

¶22 In response, Semler asserted that the Garage Unit had been validly subdivided into separate units and that he had superior title to spaces C and D. He further argued

10

that Perfect Place obtained the 2011 Quitclaim Deed from Watson through fraudulent misrepresentations.

¶23    After a three-day bench trial, the trial court held that the Garage Unit was properly subdivided into three units, either because 1940 Blake Street Corporation had already subdivided the Garage Unit when it filed the Declaration or because Watson subdivided the Garage Unit by physically marking off the separate spaces. The court further held that the 2011 Quitclaim Deed was void because it was procured through fraud and unclean hands, and that Semler was the rightful owner of parking spaces C and D. The court ordered Semler to submit a proposed decree that included proposed amendments to the Declaration, the map, and the list of units with their percentages of ownership of the common elements. The court also denied Semler's request for attorney fees.

¶24    After reviewing several alternative proposed maps for the parking spaces, the trial court adopted a map that reallocated the sizes of the three spaces in an attempt to make space E more usable. In so doing, the court enlarged space E and reduced the size of space D.

¶25    Perfect Place appealed the trial court's judgment as to the ownership of parking spaces C and D. Semler cross-appealed the trial court's enlargement of space E at the expense of space D and the trial court's denial of his request for attorney fees.

¶26    In a unanimous published decision, the court of appeals affirmed the trial court's conclusions that the Garage Unit was properly subdivided and that Semler owned spaces C and D. Perfect Place v. Semler, 2016 COA 152M, ¶ 2, ___ P.3d ___, as modified on denial of reh'g (Jan. 12, 2017). However, the court of appeals held that the trial court

11

erred by enlarging the size of space E and also by denying Semler's request for attorney fees and thus reversed in part and remanded for further proceedings. Id.

¶27 The court of appeals first determined that section 38-33.3-213 of CCIOA governing the subdivision of units requires only substantial—not strict—compliance. Id. at ¶¶ 1, 32. The court observed that section 38-33.3-213(2) "clearly requires" an owner to submit to the executive board of the condominium a subdivision application that includes amendments to the declaration and a map clearly identifying the subdivided units. Id. at ¶¶ 25–26. However, the court concluded that section 38-33.3-213(2) was arguably discretionary because paragraphs (a) and (b) used phrases like "if any" and "as may be necessary" in reference to the proposed reallocation of interests and amendments and maps showing the newly created units and their dimensions. Id. at ¶ 27. The court also reasoned that although section 38-33.3-213(3) states that subdivision will not be effected without corresponding amendments to the declaration or the recorded map, the statute "does not provide any consequence for noncompliance with its other provisions," suggesting that "the statutory language is discretionary rather than mandatory." Id. at ¶ 28.

¶28 The court therefore considered CCIOA as a whole to discern the purpose of section 38-33.3-213 in order to determine whether it requires substantial or strict compliance. Id. at ¶¶ 28–32. Because amendments to a declaration under section 38-33.3-213 do not require approval of at least a majority of association members (unlike other amendments governed by section 38-33.3-217), the court of appeals reasoned that the application requirement in section 38-33.3-213 serves merely to provide notice to the condominium

12

board of a unit owner's intent to subdivide a unit in accordance with the declaration, and to assure the board that the subdivision will be properly memorialized in the recorded map or declaration; once recorded, the map alerts title companies, taxing authorities, and other interested parties of the existence of the new unit. Id. at ¶¶ 30–31. The court concluded that, because section 38-33.3-213 serves only to provide notice to the board of an owner's intent to subdivide a unit, and because the statute did not specify any consequence for noncompliance with its provisions, substantial compliance with the statute was all the legislature required. See id. at ¶¶ 32, 36.

¶29 Here, the court of appeals concluded, Watson's subdivision of the parking spaces substantially complied with section 38-33.3-213 and the subdivision was therefore valid. Id. at ¶ 44. The court stated that Watson's status as both property owner and condominium board member of the Building effectively put the board on notice of the subdivision; there was no evidence that Watson's marking of the parking spaces violated any laws; the Building's condominium association knew the size and percentage ownership of each space; and the map attached to the Declaration "clearly shows" the Garage Unit "divided into three separate units and identifies them as C, D, and E." Id. at ¶¶ 40–43. Under these circumstances, the court of appeals held, Watson satisfied the purpose of section 38-33.3-213 and therefore substantially complied with the statute. Id. at ¶ 44.

¶30 Because the court of appeals agreed with the trial court's determination that Watson validly subdivided the Garage Unit, the court of appeals declined to address the

trial court's alternate finding that 1940 Blake Street Corporation subdivided the Garage Unit when it filed the original declaration for the Building.  Id. at ¶ 18.

¶31     Next, the court of appeals concluded that the trial court properly declared the 2011 Quitclaim Deed void.  Id. at ¶¶ 59–61.  The court of appeals concluded the deed was procured through "fraud in the factum" because Perfect Place's attorney had fostered Watson's belief that the 2011 Quitclaim Deed merely corrected a technical defect in the title by representing that Perfect Place lawfully owned all three spaces.  Id. at ¶ 60. Because a deed obtained by fraud in the factum is void, the court of appeals upheld the trial court's decision to void the 2011 Quitclaim Deed, and affirmed the trial court's finding that Semler was the rightful owner of spaces C and D.  See id. at ¶¶ 61, 72, 76, 82.

¶32     The court of appeals next held that the trial court abused its discretion by amending the map to adopt parking space boundaries inconsistent with evidence of their historical use, and by enlarging space E in favor of Perfect Place — a party the trial court held had acted with unclean hands.  Id. at ¶¶ 67–68.

¶33     Finally, the court of appeals held the trial court abused its discretion by denying Semler's request for attorney fees.  Id. at ¶ 81.  The court of appeals reasoned that CCIOA authorizes attorney fee awards to the prevailing party in a title dispute and that Semler had prevailed in this litigation.  Id. at ¶¶ 80–81.  Accordingly, the court of appeals affirmed in part and reversed in part the trial court's judgment, and remanded the case with instructions to return the boundaries of spaces D and E to their historical dimensions and to award Semler his reasonable attorney fees.  Id. at ¶ 82.

¶34     We granted Perfect Place's petition for certiorari review.

14

¶35    We first examine the text of the relevant CCIOA subdivision provisions to determine whether Watson validly subdivided the Garage Unit.  Under the plain language of section 38-33.3-213(3), "no subdivision of units shall be effected" without executing and recording the necessary amendments to the condominium declaration, plats, or maps pursuant to section 38-33.3-217(3) and (5) of CCIOA.  Because there is no evidence that Watson caused any documents to be filed or recorded in connection with his purported subdivision, we hold that Watson did not accomplish a valid subdivision of the Garage Unit.

¶36    Next, we consider the court of appeals' determination that the 2011 Quitclaim Deed was procured through "fraud in the factum" and was therefore void.  Although evidence in the record suggests that Perfect Place obtained the 2011 Quitclaim Deed through certain misrepresentations, fraud in the factum requires proof that the grantor was ignorant of the nature of the deed itself.  Because the evidence reflects that Watson understood he was signing a quitclaim deed to convey to Perfect Place any interest he might have had in the Garage Unit, we conclude that the court of appeals erred in holding the deed was void on this ground.

¶37    In light of our holdings that Watson did not accomplish a valid subdivision of the Garage Unit and that the 2011 Quitclaim Deed was not void for fraud in the factum, remand is necessary to determine the resulting chain of title for spaces C and D.

¶38    Because it is unclear who holds superior title to spaces C and D, we do not reach the remaining issues on which we granted certiorari review—namely, whether the trial

court's reallocation of the sizes of the parking spaces constituted an abuse of discretion, and whether Semler is entitled to attorney fees as a prevailing party.

## A. Standard of Review

¶39 We review a trial court's factual findings for clear error, but we review questions of law de novo. See In re Marriage of de Koning, 2016 CO 2, ¶ 17, 364 P.3d 494, 496; Sunahara v. State Farm Mut. Auto. Ins. Co., 2012 CO 30M, ¶ 12, 280 P.3d 649, 653.

¶40 We review questions of statutory interpretation de novo. Kinder Morgan CO2 Co., L.P. v. Montezuma Cty. Bd. of Comm'rs, 2017 CO 72, ¶ 23, 396 P.3d 657, 664. In interpreting statutory provisions, "[o]ur objective is to effectuate the intent and purpose of the General Assembly." Trujillo v. Colo. Div. of Ins., 2014 CO 17, ¶ 12, 320 P.3d 1208, 1212–13. To determine the legislature's intent, we look first to the plain language of a statutory provision. Bostelman v. People, 162 P.3d 686, 690 (Colo. 2007). Where the statutory language is clear, we apply the plain and ordinary meaning of the provision. Trujillo, ¶ 12, 320 P.3d at 1213. Additionally, a statute must be read "as a whole, construing each provision consistently and in harmony with the overall statutory design, if possible." Whitaker v. People, 48 P.3d 555, 558 (Colo. 2002).

## B. CCIOA Subdivision Requirements

¶41 Section 38-33.3-213 of CCIOA, titled "Subdivision of units," provides that a condominium unit may be subdivided into two or more units "[i]f the declaration expressly so permits," and sets forth the procedure for accomplishing a subdivision. § 38-33.3-213(1). Subsection (1) provides that, "[s]ubject to the provisions of the declaration and other provisions of law, and pursuant to the procedures described in this

16

section, a unit owner may apply to the [condominium] association to subdivide a unit."
§ 38-33.3-213(1). Subsection (2) further provides that, "[i]n order to subdivide a unit, the unit owner of such unit, as the applicant, must submit an application to the executive board [of the condominium association]," and lists the required components of the application. § 38-33.3-213(2). The required application components include, among other things: evidence that the applicant has complied with applicable local law; the "proposed reallocation of interests"; and "the proposed form for amendments to the declaration," including any maps "as may be necessary to show the units which are created by the subdivision and their dimensions, and identifying numbers." § 38-33.3-213(2)(a)–(c).

¶42    Importantly, subsection (3) states, "No subdivision of units shall be effected without the necessary amendments to the declaration, plats, or maps, executed and recorded pursuant to section 38-33.3-217(3) and (5)." § 38-33.3-213(3) (emphases added). In turn, sections 38-33.3-217(3) and (5) provide that a condominium association shall record every amendment to a declaration in every county in which any portion of the common interest community is located. § 38-33.3-217(3), (5), C.R.S. (2018).

¶43    Under the plain language of section 38-33.3-213, an amendment to the condominium declaration reflecting the newly created units and their dimensions must be recorded to accomplish a valid subdivision. Subsection (2) requires the unit owner to submit an application to the executive board containing all relevant information that the condominium association will need to record an amendment and any other documents for the subdivision. Subsection (3) then directs the association to execute and record the amendment, including any necessary maps reflecting the newly created units and their

17

dimensions. Crucially, subsection (3) states that "[n]o subdivision of units shall be effected" if the relevant documents are not recorded.[6]

¶44 The legislature's purpose for enacting this recording requirement is obvious: to provide record notice of a subdivision, which in turn protects subsequent purchasers of a subdivided unit and facilitates resolution of title disputes. Cf. City of Lakewood v. Mavromatis, 817 P.2d 90, 94 (Colo. 1991) (noting that "[r]ecording acts have been adopted for purposes including the protection of subsequent purchasers of real property against the risk of prior secret and unknown instruments affecting title to that property" and "serve the important purpose of creating an accessible history of title").

¶45 We therefore disagree with the court of appeals' conclusion that section 38-33.3-213 serves merely to provide notice to a condominium board of a unit owner's intent to subdivide a unit. See Perfect Place, ¶ 32. Certainly, the application requirement is a mechanism to provide the board with notice of a subdivision. But if the purpose of section 38-33.3-213 is merely to require a unit owner to give notice to the board of a subdivision, then other parts of the section—particularly subsection (3)—would be

---

[6] Section 38-33.3-213 aligns closely with the subdivision provisions of the Uniform Common Interest Ownership Act ("Uniform Act"), on which CCIOA was based. Like its CCIOA counterpart, the section of the Uniform Act governing subdivision of units sets forth a two-part subdivision process: "upon application of a unit owner to subdivide a unit, the association shall prepare, execute, and record an amendment to the declaration." § 2-113, Unif. Common Interest Ownership Act (1982). Comment 1 to section 2-113 of the Uniform Act states, "A subdivision itself is accomplished by an amendment to the declaration."

18

superfluous. Read as a whole, the requirements of section 38-33.3-213 are aimed at providing record notice of a subdivision, and make clear that "no subdivision of units shall be effected" absent recording of the necessary amendments to the declaration, plats, or maps reflecting the newly created units and their dimensions.

¶46 Here, it is undisputed that Watson never caused any document reflecting a subdivision of the Garage Unit to be recorded. The recorded map attached to the Declaration suggests, at best, that the original owner of the Garage Unit (1940 Blake Street Corporation)—not Watson—possibly contemplated a subdivision of the unit. But neither the map nor the Declaration identifies the boundaries or dimensions of the individual parking spaces. Instead, the Declaration identifies the Garage Unit as a single 400 square-foot unit—one of the twelve condominium units in the Building. Moreover, the Declaration assigns the percentage of ownership of common elements to the Garage Unit as a whole, not as subdivided into individual parking units. Thus, the only recorded documents in the record depict the Garage Unit as one unit.

¶47 We are unmoved by the facts that Watson was himself a member of the Building's condominium board and that the Building's condominium association treated each space as a separate entity. Even if we agree that these facts demonstrate that the Building's board and condominium association were on notice of Watson's purported subdivision, these facts do not establish compliance with the recording requirement in section 38-33.3-213(3). Because Watson never caused any document reflecting a subdivision of the Garage Unit to be recorded, he did not accomplish a valid subdivision of the Garage Unit.

19

¶48    Echoing the court of appeals' analysis, Semler argues that section 38-33.3-213 requires only substantial—as opposed to strict—compliance, and that Watson substantially complied with the statute's subdivision requirements. We note that, unlike certain statutes such as Colorado's election code that expressly require only substantial compliance with their provisions, see, e.g., § 1-1-103(3), C.R.S. (2018) ("Substantial compliance with the provisions or intent of [the election] code shall be all that is required for the proper conduct of an election to which [the election] code applies."), CCIOA nowhere states that its provisions concerning the subdivision of units require only substantial compliance. For that matter, this court has never held that any of CCIOA's provisions may be satisfied through substantial compliance.[7] But in any event, we need

---

[7] We recently addressed compliance with statutory requirements of a different part of CCIOA in Ryan Ranch Cmty. Ass'n, Inc. v. Kelley, 2016 CO 65, 380 P.3d 137. There, we considered whether several individual lots were invalidly annexed into a common interest community because the purported annexation failed to comply with CCIOA. Id. at ¶ 3, 380 P.3d at 139. After determining that the right to annex the lots qualified as a development right under CCIOA, we examined the language of the CCIOA provisions governing development rights to ascertain the requirements for a valid annexation. Id. at ¶¶ 33-35, 380 P.3d at 144. Based on the language of these provisions, we concluded that annexation requires, among other things, recording an amendment to the common interest community declaration that contains certain specific information (set forth in section 38-33.3-210(1), C.R.S. (2018)) and indexing this amendment in a particular fashion (described in section 38-33.3-217(3), C.R.S. (2018)). Id. at ¶¶ 33, 35, 380 P.3d at 144. In that case, the documents that purportedly constituted the amendment to the declaration did not contain certain information required under section 38-33.3-210(1) and were not indexed in the manner prescribed by section 38-33.3-217(3). Id. at ¶¶ 39-50, 380 P.3d at 146–47. Because the documents "failed to comply with the specific requirements" of the relevant provisions of CCIOA, these documents "did not validly effectuate the development right of annexation as applied to" the lots in question, and we concluded the purported annexation was invalid. Id. at ¶¶ 51–52, 380 P.3d at 148. In so ruling, we

20

not decide whether section 38-33.3-213 requires strict or substantial compliance because the evidence in this case reveals that Watson did not comply with section 38-33.3-213 in any meaningful sense. As stated above, section 38-33.3-213 makes clear that recordation accomplishes a valid subdivision. None of the conduct offered here as proof of compliance, including the physical marking of the boundaries of the parking spaces, resembles or comes close to providing record notice of a subdivision.[8]

### C. Fraud in the Factum

¶49 It is well-established that deeds obtained through fraudulent acts are generally voidable, but not void. Svanidze v. Kirkendall, 169 P.3d 262, 266 (Colo. App. 2007) (citing Bray v. Trower, 286 P. 275, 278 (Colo. 1930)). A voidable deed creates legal title and conveys property to a purchaser who took the property for value in good faith and without notice of any defect in title. See Martinez v. Affordable Hous. Network, Inc., 123 P.3d 1201, 1205 (Colo. 2005).

¶50 However, a deed obtained through fraud in the factum, a particular kind of fraud, is void. Delsas ex rel. Delsas v. Centex Home Equity Co., LLC, 186 P.3d 141, 144 (Colo. App. 2008). A void deed is a legal nullity; it does not, and cannot, convey title. Upson v.

---

did not expressly address whether the development rights provisions, or any other CCIOA provisions, require strict or substantial compliance.

[8] In holding that Watson did not validly subdivide the Garage Unit, we do not address the trial court's alternate finding that the Building's original owner subdivided the Garage Unit into three separate units, as this finding falls outside the issues on which this court granted certiorari. See Graven v. Vail Assocs., Inc., 909 P.2d 514, 516 n.2 (Colo. 1995) (Jan. 16, 1996) (declining to consider issue not before court on certiorari).

21

Goodland State Bank & Tr. Co., 823 P.2d 704, 705-6 (Colo. 1992); Concord Corp. v. Huff, 355 P.2d 73, 75 (Colo. 1960).

¶51 A deed is void for fraud in the factum only where the grantor has been so fraudulently deceived about the nature of document that he or she is "excusably ignorant" about what he or she has signed. Deutsche Bank Tr. Co. Americas v. Samora, 2013 COA 81, ¶ 39, 321 P.3d 590, 598; Delsas, 186 P.3d at 144. A grantor will not be held excusably ignorant if he or she had reasonable opportunity to obtain knowledge about the document. See Deutsche Bank, ¶ 43, 321 P.3d at 598. Thus, where a grantor is aware that he or she is signing a deed that will convey title but is induced to sign the deed by fraudulent misrepresentations or undue influence, the deed will not be void for fraud in the factum; such a deed is voidable and can be relied upon and enforced by a good faith purchaser. See Deutsche Bank, ¶ 39, 321 P.3d at 598; Delsas, 186 P.3d at 144.

¶52 We conclude that the evidence here is insufficient to establish that Perfect Place procured the 2011 Quitclaim Deed through fraud in the factum. Although evidence in the record suggests that Perfect Place misled Watson regarding the chain of title for the disputed parking spaces and its reasons for seeking a quitclaim deed, the record does not indicate that Watson was excusably ignorant of the nature of the 2011 Quitclaim Deed. Perfect Place did not represent that the document was anything other than a quitclaim deed—i.e., a deed intended to convey to Perfect Place any title, interest, or claim that Watson might have had in the Garage Unit. Relevant here, Perfect Place's attorney informed Watson at the outset that Perfect Place sought a quitclaim deed. Although Perfect Place may have misled Watson as to its purpose in seeking the quitclaim deed by

22

indicating that it needed the deed to correct a "technical defect" in its title, the document Watson signed was in fact a quitclaim deed conveying an ownership interest in the Garage Unit. Furthermore, before the parties executed the 2011 Quitclaim Deed, Perfect Place's attorney alerted Watson to potential title issues surrounding the Garage Unit, thereby affording Watson reasonable opportunity to investigate the chain of title for the parking spaces and understand what interests a quitclaim deed would transfer.

¶53 We therefore disagree with the court of appeals' reasoning that Perfect Place procured the 2011 Quitclaim Deed by fraud in the factum because Perfect Place fostered Watson's belief that the deed was intended only to correct technical defects in title. See Perfect Place, ¶¶ 60–61. Even if these misrepresentations induced Watson to sign the 2011 Quitclaim deed, they pertain to the parties' reasons for entering the transaction—not to the nature of the deed itself. At most, evidence that Perfect Place misled Watson may support a finding that the 2011 Quitclaim Deed was procured through fraudulent misrepresentations or undue influence. But such a finding would render the deed voidable, not void.

¶54 Accordingly, we hold the court of appeals erred in concluding the 2011 Quitclaim Deed was void for fraud in the factum. We do not address whether the 2011 Quitclaim Deed may be void or voidable on other grounds, nor do we address the interests, if any, that the 2011 Quitclaim Deed conveyed to Perfect Place. These matters fall outside the issues on which we granted certiorari review. See Graven, 909 P.2d at 516 n.2.

23

## D. Remaining Issues

¶55    In light of our holdings that Watson's physical marking of the parking spaces did not accomplish a valid subdivision of the Garage Unit and that the 2011 Quitclaim Deed was not void for fraud in the factum, remand is necessary to determine the resulting chain of title for spaces C and D.

¶56    We decline to address the remaining issues on which we granted certiorari review, which concern whether the trial court abused its discretion in reallocating the sizes of the parking spaces and whether the court of appeals erred in determining that Semler is entitled to attorney fees as the prevailing party in this action. The propriety of any reallocation of the sizes of the parking spaces cannot be determined without first resolving who holds superior title to these spaces. Similarly, even assuming the court of appeals correctly decided that CCIOA authorizes attorney fees to prevailing parties in quiet title actions, we cannot decide which party prevailed in this action because it remains to be determined which party holds superior title to spaces C and D.

## III.  Conclusion

¶57    Because there is no evidence that Watson ever caused any documents to be filed or recorded in connection with his purported subdivision of the Garage Unit, we hold that Watson did not accomplish a valid subdivision of the Garage Unit under section 38-33.3-213 of CCIOA.

¶58    We further hold that the court of appeals erred in concluding the 2011 Quitclaim Deed was void for fraud in the factum. Fraud in the factum requires proof that the

24

grantor was ignorant of the nature of the document. Here, the evidence reflects that Watson understood he was signing a quitclaim deed.

¶59 Based on our resolution of the issues above, remand is necessary to determine the resulting chain of title for the disputed parking spaces, and we therefore decline to consider the remaining issues on which we granted certiorari review.

¶60 Accordingly, we reverse the judgment of the court of appeals and remand for further proceedings consistent with this opinion.